[683 NYS2d 179]

CAROLYN ACKERMAN et al., Appellants, v PRICE WATERHOUSE, Respondent.

CAROLYN ACKERMAN et al., Respondents, v PRICE WATERHOUSE, Appellant.

First Department, December 1, 1998

## APPEARANCES OF COUNSEL

*Richard J. Schager, Jr.,* of counsel (*Michelle Rago, Ronald D. Lefton* and *Steven G. Sonet* on the brief; *Stamell & Schager, L. L. P.; Camhy Karlinsky & Stein, L. L. P.;* and *Levy, Sonet & Siegel,* attorneys), for appellants/respondents.

*David W. Rivkin* of counsel (*Mark W. Friedman, Leigh R. Schachter* and *Rodman W. Benedict, Deputy General Counsel,* on the brief; *Debevoise & Plimpton,* and *Price Waterhouse, L. L. P.,* attorneys), for Price Waterhouse, respondent/appellant.

## OPINION OF THE COURT

MAZZARELLI, J.

In these consolidated appeals,[1] important issues are raised involving the liability of professional accountants for allegedly negligent tax advice rendered to the individual limited partners of 54 cosponsored limited partnerships. Among the issues to be resolved are whether the IAS Court properly denied the Ackerman plaintiffs' four separate motions for class action certification, whether defendant Price Waterhouse is entitled to summary judgment based upon the plaintiffs' inability to

---

**1.** The consolidated appeals initially included orders appealed in a related action (*Ravitch v Back, Wax, Streisfeld & Schreiber,* NY County index No. 26807/91), and a third-party action (*Back, Wax, Streisfeld & Schreiber v Price Waterhouse,* NY County index No. 2165/92). Each of the parties to these actions submitted briefs on appeal. Subsequently, however, this Court has been advised that both actions have been settled. Stipulations of discontinuance have been forwarded to the Court, and the noticed appeals have been withdrawn. Accordingly, we address only the issues raised in the action entitled *Ackerman v Price Waterhouse* (NY County index No. 15639/90).

demonstrate reliance on defendant's alleged misrepresentations, or because the claims are barred by the Statute of Limitations, and whether a settlement in a related Federal action entitles Price Waterhouse to a setoff of the damages obtained by the plaintiffs in that settlement. As detailed below, in Appeal No. 61788, we affirm the IAS Court's denial of the Ackerman plaintiffs' second motion for class certification for the reasons stated by that court. In Appeal No. 61789, we modify to the extent of granting the Ackerman plaintiffs' third motion for class certification relating to New York residents only and vacating the imposition of sanctions against counsel for the Ackerman plaintiffs. In Appeal No. 61790, we affirm the order of the IAS Court granting Price Waterhouse's motion for summary judgment only to the extent of limiting the damages recoverable.

I.

FACTS

The Ackerman plaintiffs are individuals from 38 different States and four foreign nations who invested in tax shelter limited partnerships between 1980 and 1982. The limited partnerships were formed to acquire K-Mart shopping centers throughout the United States. All of the 54 limited partnerships were sponsored by the same entity, Commercial Properties Group, Inc. (CPG). From 1980-1989, CPG engaged defendant Price Waterhouse (PW) to render annual accounting services and to prepare the limited partnerships' Schedules K-1, which report each limited partner's pro rata share of income and expenses.[2] PW transmitted these returns and schedules to CPG each year, and was aware that the documents would be transferred to the individual limited partners "for filing" with their Federal and State income tax returns.

It is undisputed that between 1980 and 1988, PW utilized an accounting practice known as the Rule of 78's in calculating each limited partner's accrued interest deduction on their Schedules K-1. The Rule of 78's is an accounting practice that allocates greater interest deductions to the earlier years of the debt. CPG informed potential investors, by way of the offering materials, that the general partners intended to employ the Rule of 78's in calculating the accrued interest deduction, and that the IRS might disapprove such method, possibly resulting in an audit and the loss of tax benefits.

---

2. The returns are known as "U.S. Partnership Return of Income" and are filed by each limited partner with their individual returns, since the partnership itself does not pay income taxes.

In 1983, the IRS issued Revenue Ruling 83-84 which specifically barred the use of the Rule of 78's in cases where the resulting deduction exceeded the true economic accrual of interest. Plaintiffs allege that after Revenue Ruling 83-84 was issued, PW discontinued the use of the Rule of 78's in calculating the accrued interest deductions for other clients, but continued to utilize it for the CPG partnerships.

In response to Revenue Ruling 83-84, PW adopted internal policy guidelines prohibiting the use of the Rule of 78's for accrued interest deductions unless (1) an alternative, acceptable method justified the deduction, or (2) an opinion letter of tax counsel was obtained stating that it was "more likely than not" that the practice would be upheld if challenged by the IRS. In December 1983, PW was furnished, at its own request, with a letter from tax counsel stating that it was "more likely than not" that the CPG limited partners would prevail if the IRS challenged the use of the Rule of 78's with respect to transactions, such as this one, which *predated* Revenue Ruling 83-84. Tax counsel further gave its opinion that based on its analysis of current IRS policy and prior revenue rulings, "the Commissioner cannot properly assert that [Revenue Ruling] 83-84 has retroactive effect." In its 1984 transmittal letter to the limited partners accompanying the Schedules K-1, PW summarized tax counsel's opinions regarding the revenue ruling and stated that it had relied on such opinion in preparing the partnership tax returns. However, PW's transmittal letter omitted much of the detail in counsel's opinion letter, including the warning that the IRS had explicit statutory authority to determine whether a Revenue Ruling "shall be applied without retroactive effect" (Internal Revenue Code [26 USC] § 7805 [b] [8]).

In March 1985, PW obtained an "updated" opinion letter from tax counsel regarding the continued use of the Rule of 78's.[3] In this second letter, counsel again expressed its opinion that it was more likely than not that any challenge by the IRS to the use of the Rule of 78's regarding the CPG limited partnerships would fail. This letter included several specific warnings including that the IRS Revenue Rulings are "presumed to be retroactive" unless otherwise indicated, that an interest rate penalty of 120% could be imposed if the IRS found the investments to be "tax motivated transactions", that

---

3. The IAS Court found, and plaintiffs continue to argue, that counsel's letters were not an "opinion" but rather were "couched in terms of beliefs." Our review of these letters reveals that the terms "opinion" and "belief" were used interchangeably with respect to the crucial representations in this case.

continued use of the Rule of 78's in computing interest deductions "would no doubt provoke vigorous opposition from the IRS and probably result in litigation," and that if the limited partners were unsuccessful in this litigation they would have to recapture interest deductions previously taken and be liable for interest and penalties for the amount recaptured. Again, these specific warnings were omitted from PW's subsequent transmittal letters sent to plaintiffs.

Meanwhile, in 1983 the IRS began auditing the CPG-sponsored limited partnerships, resulting in deficiency notices being issued to several limited partners. During the pendency of the audits, PW continued to advise the limited partners that the interest deductions would be upheld. In PW's 1988 audit reports sent to the limited partners, PW stated that "the General Partner and special tax counsel continue to be of the opinion" that the continued use of the Rule of 78's in computing interest deductions would survive IRS challenge. Further, PW stated in a 1985 letter that it would be "handl[ing] [the audit] on behalf of the partnership in general and on your behalf as limited partner," and advised the partners to refuse a pending IRS settlement offer.

The Ackerman plaintiffs contested the tax deficiencies by commencing administrative proceedings. Once the administrative appeals were exhausted, several plaintiffs filed petitions in the United States Tax Court, while others stayed their protest pending determination by the Tax Court in an unrelated test case. In that December 1988 test case, the United States Tax Court upheld the retroactive application of Revenue Ruling 83-84 by the IRS (see, *Prabel v Commissioner of Internal Revenue*, 91 TC 1101 [hereinafter *Prabel*]), which determination was affirmed by the Third Circuit Court of Appeals in August 1989 (see, *Prabel v Commissioner of Internal Revenue*, 882 F2d 820). In *Prabel*, the Tax Court held that there were no revenue rulings or any other existing authority permitting utilization of the Rule of 78's accrual method in long-term real estate loans, and that therefore, the tax advisors to the partnerships in *Prabel* could not have relied on authority that "did not exist."

As the limited partnership investments in this case were similar to the long-term loans in *Prabel*, it became clear that the IRS would reject the use of the Rule of 78's with respect to the CPG limited partnerships. In March 1989, three months after the *Prabel* decision, PW prepared and forwarded to the limited partners the 1988 Schedules K-1, which continued to utilize the Rule of 78's. This time, however, CPG (not PW) at-

tached a letter advising the limited partners not to rely on the Schedules K-1.

Prior to the determination in *Prabel*, the IRS had offered plaintiffs a 100% deduction of capital contributions—but in the wake of *Prabel*, it reduced that offer to 85%, which the plaintiffs were encouraged by new counsel to accept, and plaintiff Ackerman did so. In addition, the IRS concluded that the CPG limited partnerships were "tax motivated transactions" and assessed penalty interest on the unpaid taxes.

In 1989, some of the limited partners of CPG partnerships commenced a class action in United States District Court for the Eastern District of New York (*see, Graf v Commercial Props. Group*, 89 Civ 2057 [hereinafter *Graf* action]) against CPG, PW and others, alleging fraud in relation to the sale of the limited partnership interests.[4] CPG and other defendants settled the action with the plaintiffs for $40 million, plus an agreement to restructure the limited partnerships. PW, however, was not a party to the *Graf* settlement and the action was discontinued against it without prejudice.

In April 1990, the Ackerman plaintiffs commenced this action in State court against PW, alleging negligence and accountant malpractice regarding PW's continued use of the Rule of 78's in the preparation of the Schedules K-1 for the CPG limited partnerships. The complaint was subsequently amended in February 1994 to add two causes of action for breach of contract.

Class Certification Motions

In April 1993, the Ackerman plaintiffs moved pursuant to CPLR 901 and 902 for an order certifying a class and for the appointment of plaintiff Ackerman as class representative. The proposed class was defined as all investors in CPG-sponsored limited partnerships during the relevant period who had not received a 90-day deficiency notice from the IRS prior to April 1986, and who had not signed a settlement agreement with the IRS or paid the disputed amount relating to the use of the Rule of 78's. The proposed class was divided into two subclasses of (a) residents of New York or any other State that maintains a three-year Statute of Limitations for accountant malpractice or negligence by an accountant; and (b) residents of the State of Pennsylvania or any other State that has a two-year Statute of Limitations period for the same claims.

---

**4.** Many of the Ackerman plaintiffs were plaintiffs in the *Graf* action.

In support of their motion, the Ackerman plaintiffs alleged that all of the requirements of CPLR 901 and 902 had been satisfied. With respect to the second requirement in CPLR 901, that common questions of law or fact predominate over any questions affecting only individual members (CPLR 901 [a] [2]), the Ackerman plaintiffs pointed to the common issue of whether PW was negligent or committed malpractice in preparing each partner's Schedules K-1, or made any negligent misrepresentations with respect thereto.

PW opposed the motion, arguing that plaintiff Ackerman's claims were atypical of the class she purported to represent because she was an unsophisticated investor who stated during discovery that she relied on her personal accountant for all investment decisions. PW also asserted that common questions did not predominate because the court would have to apply the laws of the different States where the plaintiffs resided, and that the States had different standards for proving accountant malpractice. PW also claimed that individual issues of reliance existed since many class members relied on advice from their personal accountants regarding use of the Schedules K-1.

By order entered November 16, 1993, the IAS Court denied the motion for class certification, with leave to renew after discovery concerning the place of residence of the proposed class members, and a showing of unity of standards for liability on the claims in plaintiffs' complaint. Without such evidence, the court concluded that plaintiffs had failed to demonstrate that common issues of law or fact predominated. This order was not appealed.

In March 1994, after amending the complaint to add the breach of contract claims, the Ackerman plaintiffs renewed their motion for class certification. They provided information regarding the residences of the proposed class, consisting of 38 States and four foreign countries. New York, with 525 partners or 36%, and Pennsylvania, with 192 partners or 13%, were the States with the largest percentage of partners. The Ackerman plaintiffs again highlighted the common course of conduct by PW in preparing the Schedules K-1, and the limited partners' reliance thereon. By order dated November 15, 1994, the IAS Court again denied class certification on the basis that the application of the law of different jurisdictions to each of plaintiffs' claims in contract and tort, both as to the substantive claims and defenses as well as Statute of Limitations, would require the court to scrutinize the possibly conflicting law of multiple jurisdictions. The court concluded that these possible conflicts

of law problems weighed strongly against granting class certification. The Ackerman plaintiffs filed a notice of appeal on December 9, 1994 (Appeal No. 61788). Around this time, the IAS Court also warned the Ackerman plaintiffs' counsel that renewal of the class certification motions might result in sanctions.

Nevertheless, in June and August 1995, respectively, the Ackerman plaintiffs filed two additional motions for class certification. The June motion sought certification for a limited class of investors in CPG limited partnerships who were residents of New York State, or, alternatively, for certification of either the New York residents' contract or tort claims. The August motion sought to certify a class of all remaining class members who were not residents of New York, and asserted that Pennsylvania law should be applied to the contract claims of these class members.

In the second order appealed from (Appeal No. 61789), entered April 22, 1997, the IAS Court denied both class certification motions and imposed a $5,000 sanction against plaintiffs' counsel for bringing the motions, stating that the original impediments to certification remained. The court reasoned that individual issues of reliance would still predominate in a class action by only New York investors. Regarding what it termed as the "Global Class Application," the court rejected the plaintiffs' claim that Pennsylvania law, rather than the law of each plaintiff's residence, would apply, and found that claim irresponsible since a contract action against an accountant for malpractice in Pennsylvania was more limited in scope than under New York law. The court further found that Ackerman's claims were atypical due to her lack of sophistication, and that she was an inadequate class representative for that reason and because of her apparent indifference to the litigation.

Summary Judgment Motions

In August 1995, PW moved for summary judgment dismissing the class action complaint. PW argued that reasonable reliance by the investors-clients was an indispensable element of an accounting malpractice action, brought in tort or contract, and that the element of reliance was negated in this case by the warnings in the CPG limited partnerships' offering memoranda regarding the use of the Rule of 78's. PW made the additional arguments that no proximate cause existed between PW's representations and plaintiffs' injuries because the plaintiffs relied exclusively on their personal accountants for

tax advice; that PW's use of the Rule of 78's did not constitute negligence since the law was unsettled at the time of the investments; that plaintiffs were not damaged because recovery of back taxes and interest are legally barred; and that many of the claims were time barred based on a retroactive application of the recent amendment to CPLR 214 (6), which clarified that the Statute of Limitations for professional malpractice actions is three years, irrespective of whether the claim is asserted in tort or contract.

The Ackerman plaintiffs opposed the motion, arguing that the disclosures in the offering memoranda did not absolve PW from its responsibility to provide professional services under the contract, especially in light of Revenue Ruling 83-84 and the subsequent *Prabel* ruling announcing the IRS's disapproval of the Rule of 78's. Plaintiffs also presented evidence concerning PW's provision of accounting services until 1989, thereby supporting a claim for continuous treatment and a corresponding toll of the Statute of Limitations.

In the third order on appeal (Appeal No. 61790), entered April 29, 1997, the IAS Court granted PW's summary judgment motion only to the extent of limiting damages to those directly attributable to the improper use of the Rule of 78's, and otherwise denied the request for summary relief. The court found that triable issues of fact existed as to whether PW's conduct constituted malpractice, whether the plaintiffs reasonably relied on the alleged misrepresentations of PW and whether that reliance was negated by the warnings in the offering memoranda. The IAS Court also rejected PW's Statute of Limitations arguments, finding that the amendment to CPLR 214 (6) did not apply retroactively, and that the continuous treatment doctrine was applicable to toll the Statute of Limitations for accountant malpractice.

II.

DISCUSSION

A. CLASS CERTIFICATION

The Ackerman plaintiffs appeal the IAS Court's denial of their second, third and fourth motions for class certification, and its imposition of sanctions. The court's decisions make clear that the motions were denied for three primary reasons. First, common issues of law did not predominate because the different laws of each jurisdiction where the plaintiffs resided would apply to their respective claims, and those States' laws vary significantly regarding the scope and theories of accoun-

tant malpractice liability, and the defenses available to such claims, including the Statute of Limitations. Second, individual issues of reliance would predominate in the actions since the limited partners had varying reactions to the communications from PW, and some of them relied exclusively on their personal accountants. Third, Ackerman was not a proper class representative because her claims were not typical of most class members, and she and her counsel were not competent to represent the interests of the class she purported to represent. As detailed below, we respectfully disagree with the second and third reasons, and partially disagree with the first.

A class action may be maintained in New York only after the following five prerequisites of CPLR 901 (a) have been met: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact predominate over any questions affecting only individual members; (3) the claims of the representative parties are typical of the class as a whole; (4) the representative parties will fairly and adequately protect the interests of the class; and (5) the class action is superior to other available methods for the fair and efficient adjudication of the controversy (CPLR 901 [a] [1]-[5]; *see, Matter of Colt Indus. Shareholder Litig.*, 77 NY2d 185, 194; *Friar v Vanguard Holding Corp.*, 78 AD2d 83, 90-91).

Once these prerequisites are satisfied, the court must consider the factors set out in CPLR 902, to wit, the possible interest of class members in maintaining separate actions and the feasibility thereof, the existence of pending litigation regarding the same controversy, the desirability of the proposed class forum and the difficulties likely to be encountered in the management of a class action (CPLR 902 [1]-[5]; *see, Askey v Occidental Chem. Corp.*, 102 AD2d 130, 137). Plaintiff bears the burden of establishing compliance with the requirements of both CPLR 901 and 902, and the determination is ultimately vested in the sound discretion of the trial court (*supra,* at 137).

The predominance requirement has been termed the "most troublesome" of the CPLR 901 requirements (*Friar v Vanguard Holding Corp., supra,* at 96), and it is the pivotal question on this appeal. As the Ackerman plaintiffs challenge the IAS Court's conclusion that common questions of law do not predominate due to the necessity of applying conflicting laws from various jurisdictions, we must briefly turn to the relevant choice of law principles.

## 1. Choice of Law Issues

■ Our choice of law rules with respect to tort and contract cases are firmly established. "In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation" (*Padula v Lilarn Props. Corp.*, 84 NY2d 519, 521; *Cooney v Osgood Mach.*, 81 NY2d 66, 72). "The greater interest is determined by an evaluation of the ' "facts or contacts which * * * relate to the purpose of the particular law in conflict" ' " (*Padula v Lilarn Props. Corp., supra,* at 521, quoting *Schultz v Boy Scouts*, 65 NY2d 189, 197).

New York applies a "grouping of contacts" or "center of gravity" approach to choice of law questions in contract cases (*Zurich Ins. Co. v Shearson Lehman Hutton*, 84 NY2d 309, 317; *Matter of Allstate Ins. Co. [Stolarz—New Jersey Mfrs. Ins. Co.]*, 81 NY2d 219, 226). The five generally significant contacts in contract cases are: the place of contracting, negotiation and performance of the contract; the location of the subject matter of the contract; and the domicile of the parties (Restatement [Second] of Conflict of Laws § 188 [2]; *Matter of Allstate Ins. Co. [Stolarz—New Jersey Mfrs. Ins. Co.], supra,* at 227). A court considering these factors must focus on the contacts that are significant in the particular contract dispute (*supra,* at 226).

(i) New York Class

Applying these tests to the proposed class of New York residents, we believe that the IAS Court could properly apply the law of a single State, either New York or Pennsylvania, to the plaintiffs' tort and contract claims, thereby obviating any conflicts of laws problem. In this class, all the plaintiffs are New York residents, and PW's main offices are located in New York as well.[5] With respect to the tort causes of action, the interest analysis approach would mandate application of New York law. Where the laws alleged to be in conflict are conduct regulating, such as the standards for liability of accountants, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders" (*Cooney v Osgood Mach.,* 81 NY2d 66, 72, *supra*). The place of occurrence of the tort

---

5. A partnership's legal residence is where it maintains its principal place of business (*see, Schultz v Boy Scouts, supra,* at 194; *Wilcox v PRC of N. Y. Ltd. Partnership*, 1997 US Dist LEXIS 3854 [ND NY, Mar. 24, 1997, Munson, J.]; *McMahan & Co. v Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F Supp 833, 834 [SD NY 1989]).

will be where the plaintiff suffered the injury sued upon (*Schultz v Boy Scouts, supra,* at 195).

In this proposed class, the place of injury is New York since that is where the New York plaintiffs felt the economic injury of the IRS's disallowance of the tax deductions (*supra,* at 195 [when defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred]; *see also, Altschuler v University of Pa. Law School,* 1997 US Dist LEXIS 3248 [SD NY, Mar. 21, 1997, Stanton, J.]; *Kramer v Showa Denko K.K.,* 929 F Supp 733, 741). Thus, since the plaintiffs' injuries occurred in New York, New York law will apply to the tort claims.

Even if the other allegedly conflicting rules, such as those regarding contributory negligence and assumption of the risk, are considered loss allocating, the same result obtains. Under the interest analysis test, "[w]here the conflicting rules at issue are loss allocating and the parties to the lawsuit share a common domicile, the loss allocation rule of the common domicile will apply" (*Padula v Lilarn Props. Corp., supra,* at 522, citing *Cooney v Osgood Mach., supra,* at 73). Here, the New York plaintiffs and PW are residents of the same State, which mandates application of New York's loss allocation rules.

As to the New York residents' contract causes of action, a grouping of contacts analysis would recommend application of Pennsylvania or New York law. Plaintiffs note that the retainer agreement between PW and CPG was negotiated and entered into in Pennsylvania, all the tax preparation work, including the preparation of the Schedules K-1, was completed in PW's offices in Philadelphia, Pennsylvania, and the partnership returns and schedules were delivered to CPG in Pennsylvania. Of lesser significance is that the CPG partnership was organized under the laws of Pennsylvania and the partnership agreements provided that they are to be construed under Pennsylvania law. The other contacts are with New York— chiefly the parties' residences and the location where the plaintiffs received the subject matter of the contract. For present purposes, we need not decide which jurisdiction has the greater contacts—it is sufficient to conclude that the trial court could apply one of these State's laws to the New York residents' contract claims, and, thus, no conflict problem exists.

(ii) Global Class

▉ With respect to the applications for certification of a global class (the second and fourth motions), we come to the

opposite conclusion. Although we have some reservations concerning the IAS Court's summary finding that the substantive law of the jurisdiction of each plaintiff's residence will apply to the contract claims of the global class, we nonetheless conclude, as the IAS Court did, that the plaintiffs have not met their burden of establishing that the relevant choice of law principles will not ultimately require application of widely divergent laws of multiple jurisdictions concerning the claims and defenses in this action (*see, In re Laser Arms Corp. Sec. Litig.*, 794 F Supp 475 [SD NY 1989], *affd* 969 F2d 15 [2d Cir 1992]; *Bresson v Thomson McKinnon Sec.*, 118 FRD 339, 344 [SD NY 1988]).

PW has persuasively argued that the differences in the various States' laws in several pertinent areas compel the conclusion that common questions of law would not predominate in the global class action. For example, in some jurisdictions, including New York, a professional may be held liable for negligent misrepresentation only to those in actual privity, "or near privity" with the defendant (*Credit Alliance Corp. v Andersen & Co.*, 65 NY2d 536; *Ward v Ernst & Young*, 246 Va 317, 324, 435 SE2d 628, 631 [Sup Ct Va 1993]; *Robertson v White*, 633 F Supp 954, 970-971 [Arkansas law]). Conversely, a majority of States have adopted the slightly different view found in Restatement (Second) of Torts § 552 that a professional may be liable only to a limited group of persons for whose benefit the professional intended to supply the information, or knew that the recipient intended to supply it (*see, Nycal Corp. v KPMG Peat Marwick*, 426 Mass 491, 688 NE2d 1368 [Sup Jud Ct Mass 1998]; *Bily v Arthur Young & Co.*, 3 Cal 4th 370, 11 Cal Rptr 2d 51 [Sup Ct Cal 1992]; *Scottish Heritable Trust v Peat Marwick Main & Co.*, 81 F3d 606 [5th Cir 1996] [Texas law], *cert denied* 519 US 869; *First Fla. Bank v Mitchell & Co.*, 558 So 2d 9 [Fla Sup Ct 1990]).

Similarly, while under New York law a malpractice action against a professional may properly be pleaded in contract or tort (*Santulli v Englert, Reilly & McHugh,* 78 NY2d 700), other jurisdictions have held that such actions lie only in tort (*Federal Deposit Ins. Corp. v Clark*, 978 F2d 1541, 1552 [10th Cir 1992] [applying Colorado law]; *Federal Deposit Ins. Corp. v Ernst & Young*, 967 F2d 166, 172 [5th Cir 1992] [applying Texas law]; *Brueck v Krings*, 230 Kan 466, 638 P2d 904 [Sup Ct Kan 1982]).

Even more divergent are the various jurisdictions' laws concerning the defenses of comparative negligence and assump-

tion of risk. A minority of jurisdictions retain pure contributory negligence rules whereby a client's negligence will operate as an absolute bar to recovery in a malpractice action against a professional (*see, Pizel v Whalen*, 252 Kan 384, 845 P2d 37 [Sup Ct Kan 1993] [contributory negligence defense available in legal malpractice action]; *Wegad v Howard St. Jewelers*, 326 Md 409, 605 A2d 123 [Ct App Md 1992] [contributory negligence is a defense in accountant malpractice action]; *Lyle, Siegel, Croshaw & Beale v Tidewater Capital Corp.*, 249 Va 426, 457 SE2d 28 [Sup Ct Va 1995]). In other jurisdictions, courts have held that the defense of contributory or comparative negligence is available only where the client's negligence contributed to the professional's failure to perform the contract (*see, Fullmer v Wohlfeiler & Beck*, 905 F2d 1394 [10th Cir 1990] [under Utah law]; *Lincoln Grain v Coopers & Lybrand*, 216 Neb 433, 345 NW2d 300 [Sup Ct Neb 1984]; *see also, National Sur. Corp. v Lybrand*, 256 App Div 226). Still other States have adopted comparative negligence rules that operate to reduce the client's recovery by the percentage it contributed to the loss (*see, Halla Nursery v Baumann-Furrie & Co.*, 454 NW2d 905 [Sup Ct Minn 1990]; *Capital Mtge. Corp. v Coopers & Lybrand*, 142 Mich App 531, 369 NW2d 922 [1985]; *Devco Premium Fin. Co. v North Riv. Ins. Co.*, 450 So 2d 1216 [Fla Dist Ct App 1984]).

Distinctions also exist regarding the defense of assumption of risk (*compare, Dantzler v S.P. Parks, Inc.*, 715 F Supp 680, 683-684 [ED Pa 1989] [assumption of risk applies as complete bar to recovery], *with Blair v Mt. Hood Meadows Dev. Corp.*, 291 Ore 293, 300, 630 P2d 827, 831 [1981]; Conn Gen Stat Annot § 52-572h [assumption of risk doctrine abolished]). These variations alone support the IAS Court's conclusion that certification of the global class would be entirely unmanageable, and result in a series of mini-trials.

Moreover, even if the substantive law of a single State could conceivably be applied to the claims of the global class, there is a strong likelihood that the Statute of Limitations of each plaintiffs' State of residence will apply to their claims under CPLR 202. CPLR 202, New York's "borrowing statute," provides that in actions brought by non-New York residents, the shorter of the New York Statute of Limitations or the limitations period of the jurisdiction where the cause of action accrued will apply. "Critical to the application of the borrowing statute is the determination of the jurisdiction in which a cause of action 'accrues'." (*Martin v Dierck Equip. Co.*, 43 NY2d 583, 589.)

Most courts that have addressed this issue have applied a "place of injury" test in determining where a cause of action has accrued for purposes of the borrowing statute (*see, Investigative Group v Brooke Group,* 1997 US Dist LEXIS 18513 [SD NY, Nov. 20, 1997, Haight, J.]; *Stafford v International Harvester Co.,* 668 F2d 142, 149-150 [2d Cir 1981]). We agree and hold that the multi-State plaintiffs' contract claims for economic damage accrued in the place where they were injured, which in this case was in their States of residence "where the economic impact of the defendant's conduct [was] felt" (*see, Sack v Low,* 478 F2d 360, 366 [2d Cir 1973]; *Block v First Blood Assocs.,* 988 F2d 344 [2d Cir 1993]; *Investigative Group v Brooke Group, supra,* at * 9; *see also, Ackerman v Price Waterhouse,* 84 NY2d 535, 541; *Martin v Dierck Equip. Co., supra,* at 591 [even if breach of warranty claim could be brought under contract theory, the cause of action still accrued at place of injury]). Recognizing it would potentially be forced to examine the Statutes of Limitations of multiple jurisdictions, including the various tolls and extensions that those jurisdictions permit, the IAS Court ruled that this was another ground to deny class certification (*see, Georgine v Amchem Prods.,* 83 F3d 610 [3d Cir 1996], *affd sub nom. Anchem Prods. v Windsor,* 521 US 591, 117 S Ct 2231). We fully agree with this determination.

## 2. Reliance Issues

We also disagree with the court's conclusion that individual issues of reliance predominate over the issues common to all class members, to wit, whether PW breached its contract with the CPG partners to provide professional accounting services, and whether PW was negligent and/or committed malpractice by its continued use of the Rule of 78's, and its omission of the various warnings, after Revenue Ruling 83-84 was issued.

This conclusion is easily reached with respect to the New York residents' breach of contract claims. Under New York law, a breach of contract action for professional services may be based on an implied promise to exercise due care in performing the services required by the contract (*Santulli v Englert Reilly & McHugh,* 78 NY2d 700, 705, *supra*). No specific promise to achieve a specific result is required (*supra*). Thus, any purported reliance by the plaintiffs on actions or representations by the defendant is irrelevant (*see, Hoerger v Board of Educ.,* 98 AD2d 274, 283).

The issue of whether reliance predominates in the New York residents' negligence and malpractice causes of action is more difficult. Generally, reliance is an element of a negligent misrepresentation claim against a professional (*Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood,* 80 NY2d 377, 384). Reliance provides the requisite causal connection between the defendant's misrepresentation and the plaintiff's injury (*see, Basic Inc. v Levinson,* 485 US 224, 243; *In re Laser Arms,* 794 F Supp 475, *affd* 969 F2d 15, *supra*). However, it is less clear that proof of reliance by an individual plaintiff is required where the plaintiff is the client of the defendant, and the alleged malpractice is committed in the furtherance of the professional services provided by the defendant to plaintiff, as alleged in this case.

Plaintiffs urge that under circumstances analogous to those present here, reliance upon a defendant's negligent misrepresentations may be presumed. The analogy drawn is to those Federal cases applying a rebuttable presumption of reliance in actions brought under the Federal securities laws for false statements of material fact or material omissions in connection with the sale or purchase of securities (15 USC § 78j [b]; 17 CFR 240.10 b-5 [Rule 10b-5]). These cases discuss what is termed the "fraud-on-the-market theory," wherein reliance by purchasers of securities on the alleged misrepresentations of the issuers is presumed because the purchasers necessarily rely on the integrity of the market price in making investment decisions, which market is inexorably affected by the issuers' public statements (*see, Basic Inc. v Levinson, supra,* at 241-245).

PW notes, however, that many Federal courts deciding class action applications under Federal Rules of Procedure, rule 23 have granted certification regarding the Federal securities causes of action, while denying certification on common-law fraud and misrepresentation claims, due to the inapplicability of the presumption of reliance to the latter (*see, In re One Bancorp Sec. Litig.,* 136 FRD 526, 532-533 [D Me 1991]; *see also, Cammer v Bloom,* 711 F Supp 1264, 1297-1299 [D NJ 1989], *appeal dismissed* 993 F2d 875; *see also, Strauss v Long Is. Sports,* 60 AD2d 501, 509-510).

While we conclude that the analogy to the fraud-on-the-market theory is inapt, we do not reject a presumption of reliance in toto. In discussing the element of reliance in a Rule 10b-5 case, the Supreme Court stated in *Affiliated Ute*: "Under the circumstances of this case, involving primarily a failure to

disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. [Citations omitted.] This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." (*Affiliated Ute Citizens v United States*, 406 US 128, 153-154; *see also, Basic Inc. v Levinson, supra,* at 243.)

We believe that a presumption of reliance is available under the circumstances presented (*see, Brandon v Chefetz*, 106 AD2d 162, 167 [proof of individual reliance unnecessary in cases involving fraudulent material omissions]). Indeed, we have previously held that where a defendant makes materially misleading omissions, justifying a presumption of reliance, class certification should not be denied on the ground that individual issues of reliance exist (*see, Weinberg v Hertz Corp.*, 116 AD2d 1, 7, *affd* 69 NY2d 979; *Brandon v Chefetz, supra*; *King v Club Med,* 76 AD2d 123, 127-128). Additionally, we have stated that reliance issues are no bar to class certification where identical representations are made in writing to a large group (*see, Pruitt v Rockefeller Ctr. Props.*, 167 AD2d 14, 21). In the present case, plaintiffs allege that the Schedules K-1 were negligently prepared in the same manner, i.e., by the continued use of the disfavored Rule of 78's, and they rely on the identical written misrepresentations and omitted warnings in the transmittal letters from PW.

The New York cases discussing the scope of a professional's liability to those not in actual privity are also instructive. These cases hold that a professional may be liable for negligent misrepresentations to those in a position approaching privity where: (1) the professional making the representation is aware of the particular purpose for which it is to be used, (2) a known party relies on the statement in furtherance of that purpose, and (3) there is some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance (*see, Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood,* 80 NY2d 377, 384, *supra*; *Credit Alliance Corp. v Andersen & Co.*, 65 NY2d 536, *supra*; *Ultramares Corp. v Touche*, 255 NY 170). The theory evolved from *Glanzer v Shepard* (233 NY 236, 238-239), where a public weigher hired by a bean seller was held liable to the *buyer* who suffered a loss due to the inaccuracy of the weight. The Court of Appeals held that the law imposed a duty on the weigher in favor of the buyer despite the absence of privity because the weigher's

representations were made "for the very purpose of inducing action" by the buyer, and the buyer's action was not a collateral consequence but the "end and aim of the transaction." (*Supra,* at 238-239.)

The principle was subsequently applied in cases involving the liability of accountants such as *Ultramares Corp. v Touche* (*supra*), *White v Guarente* (43 NY2d 356), *Credit Alliance Corp. v Andersen & Co.* (*supra*) and *European Am. Bank & Trust Co. v Strauhs & Kaye* (65 NY2d 536). In *Ultramares* and *Credit Alliance* (*supra*), accountants defendants were found not liable to parties not in privity because the evidence failed to establish that the defendants prepared the financial reports for the specific use by the nonprivy. Conversely, in *White* and *European Am.* (*supra*), the accountants defendants were held liable in the absence of privity because it was found that the accountants' services were obtained for the specific purpose of providing the plaintiffs with certain information, and that the defendants were aware that plaintiffs intended to rely on the same.

Consistent with *White* and *European Am.* (*supra*), it is not disputed that PW was engaged by CPG for the specific purpose of preparing the partnership returns, including the Schedules K-1, for use by the limited partners in filing their own individual tax returns. Further, by preparing the documents, attaching a transmittal letter addressed to each partner, and indicating the Schedules K-1 "for filing," PW was plainly aware that their work was going to be relied on by the partners. Indeed, in *White* (*supra,* at 361), which, like here, involved limited partners suing the partnership's accountant for negligent preparation of tax documents, the Court stated that "the accountant must have been aware that a limited partner *would necessarily rely on or make use of* the audit and tax returns of the partnership * * * in order to properly prepare his or her own tax returns" (emphasis added).

The cases cited by PW for the proposition that the presumption is inapplicable to common-law fraud or misrepresentation claims are invariably distinguishable on the ground that they do not involve the direct professional relationship between accountant and client present here (*see, Vermeer Owners v Guterman*, 169 AD2d 442, 445, *affd* 78 NY2d 1114 [class certification denied in fraud case where no evidence that coop investors relied on misrepresentations in offering plan]; *Katz v NVF Co.*, 100 AD2d 470, 473 [individual issues of reliance predominated where shareholders alleged that they retained shares upon

public misrepresentations by corporation regarding proposed merger]; *Strauss v Long Is. Sports*, 60 AD2d 501, 507, *supra* [season ticket holders' claims for false advertising not certified where individual issues of reliance predominated]; *see also, Morgan v A. O. Smith Corp.*, 233 AD2d 375; *Norwalk v Manufacturers & Traders Trust Co.*, 80 AD2d 745, 746). The common thread running through most of these cases is the issue of whether a purchaser relied on the misrepresentations of the sellers in making the decision to purchase or retain shares. In contrast, no purchasing decision was involved here; this was an express contract to perform specific services.

We reject PW's contention that the issue of reliance predominates because the limited partners had varying reactions to the transmittal letters from PW regarding the use of the Rule of 78's (*see, Weinberg v Hertz Corp., supra; Friar v Vanguard Holding Corp., supra; Bresson v Thomson McKinnon Sec., supra*), and because many plaintiffs relied on their own personal accountants for advice on how to proceed in light of PW's representations. That some of the plaintiffs relied on their personal accountants for advice does not negate reliance on the documents prepared by PW pursuant to the accounting contract. While PW asserts that several plaintiffs did not rely on PW's Schedules K-1, this contention ignores the obvious fact that reliance is established, at least in part, by the mere submission of the Schedules K-1, prepared by PW "for filing." Moreover, as plaintiffs note, PW can hardly shift blame from themselves to the individual accountants where the information relevant to the preparation of the K-1's was solely in PW's hands (*see, Goulding v United States*, 957 F2d 1420, 1428 [7th Cir 1992]).

Nor do we believe the issue of reliance will predominate because of the initial warnings in the offering materials regarding the use of the Rule of 78's. While the use of cautionary language in offering materials may render any alleged misrepresentations immaterial as a matter of law (*In re Trump Casino Sec. Litig.*, 7 F3d 357, 371 [3d Cir 1993], *cert denied sub nom. Gollomp v Trump,* 510 US 1178), this principle, known as the "bespeaks caution" doctrine, will not insulate from liability a defendant who has failed to disclose current adverse conditions (*In re WRT Energy Sec. Litig.*, 1997 US Dist LEXIS 14009 [SD NY, Sept. 15, 1997, Keenan, J.]). As the IAS Court noted, the Ackerman plaintiffs are not suing for misrepresentation with regard to making the initial investment. Their claims are limited to PW's use of the Rule of 78's *after* the issuance of

Revenue Ruling 83-84. While the warnings in the offering materials would certainly negate any misrepresentation claim regarding the initial investment and use of the Rule of 78's, Revenue Ruling 83-84 drastically changed the circumstances. The crux of plaintiffs' argument is that PW continued to use a repudiated accounting method and made misrepresentations concerning its viability *after* its own internal evaluation of the practice. In this light, PW's initial warnings cannot absolve it of liability (*supra*).

In sum, we conclude that the causal connection between PW's alleged malpractice and plaintiffs' injuries may be readily inferred by the contractual relationship between PW and the CPG partners for specified accounting services. It must be remembered that the predominance requirement in CPLR 901 requires that common issues predominate over individual ones, not that class members be identical or that individual issues be nonexistent (*Friar v Vanguard Holding Corp.*, *supra*, at 98). Thus, the issue of reliance need not be completely removed from the case. For all these reasons, we believe plaintiffs have satisfied this element as to the proposed class of New York residents.

## 3. Typicality and Other Class Certification Issues

■ The remainder of the CPLR 901 requirements have also been satisfied. PW does not seriously dispute that the approximately 1,444 investors in CPG partnerships meet the statute's numerosity requirement (CPLR 901 [a] [1]). We disagree with the IAS Court's determination that Ackerman's[6] claims are not typical of the class she purports to represent because she was an unsophisticated investor, and because she initially misrepresented that she understood the risks of a tax shelter, when in fact she did not. Since her claims that she suffered tax losses from PW's continued use of the Rule of 78's arose out of the same course of conduct and are based on the same theories as the other class members, they are plainly typical of the entire class (*see*, *Pruitt v Rockefeller Ctr. Props.*, *supra*, at 22; *Friar v Vanguard Holding Corp.*, *supra*, at 99; *see also*, *Marisol A. v Giuliani*, 126 F3d 372, 376 [2d Cir 1997]). Ackerman's alleged misrepresentations of her financial status were both insignificant and unrelated to merits of the case or the class certification motion (*Pruitt v Rockefeller Ctr. Props.*, *supra*, at 25). We are not persuaded that Ackerman's alleged

---

**6.** We note that Ackerman was a resident of New York State during the relevant period.

lack of sophistication or indifference to the litigation render her claims atypical (*see, Brandon v Chefetz, supra,* at 170; *In re One Bancorp Sec. Litig., supra,* at 531-532).

We also disagree with the IAS Court's determination that Ackerman and her counsel will not fairly and adequately represent the interests of the class (CPLR 901 [a] [4]). The factors to be considered in determining adequacy of representation are whether any conflict exists between the representative and the class members, the representative's familiarity with the lawsuit and his or her financial resources, and the competence and experience of class counsel (*Pruitt v Rockefeller Ctr. Props., supra,* at 24; *see also, Marisol A. v Giuliani, supra,* at 378). The court stated that Ackerman's counsel was not acting in the best interests of the entire class by arguing for the application of Pennsylvania law, which would not be in the New York residents' best interests. This view, however, fails to take into account the obvious purpose of plaintiff's bifurcated class certification motions in circumventing the existing choice of law questions. We discern no conflict between Ackerman and the other class members, and conclude that her general awareness of the claims and the litigation, as demonstrated in her deposition, sufficiently qualify her to act as class representative (*Brandon v Chefetz, supra,* at 170). Lastly, we believe Ackerman's counsel has amply demonstrated its experience and skill in class action litigation, and that it will adequately represent the interest of all class members.

For many of the reasons previously stated, we disagree with the IAS Court's conclusion that a class action is not the superior method of adjudicating this controversy (CPLR 901 [a] [5]), and that the action would be unmanageable as to the New York class (CPLR 902 [5]). Since adjudication of the common issues in this case—whether PW's actions constituted negligence, professional malpractice and/or a breach of contract—would dispose of most if not all of the issues in the case, it is clearly the superior method (*Friar v Vanguard Holding Corp., supra,* at 100).

We also reverse the IAS Court's imposition of sanctions on plaintiffs' counsel for filing its third and fourth motions for class certification. Contrary to the IAS Court's view, we believe the motions were precisely addressed to overcome the impediments identified by the court in its initial denial of class certification. Further, these two motions were made only *after* crucial evidence had been discovered, namely, PW's internal policy acknowledging that the Rule of 78's should not be

utilized unless an alternative method justified the deduction or a "more likely than not" opinion was obtained.[7] This evidence enhanced plaintiffs' argument that given PW's clear concealment of a known risk, individual proof of reliance was unnecessary. We do not consider the motions "frivolous conduct" under 22 NYCRR 130-1.1 (c). Inapposite are cases where the party sanctioned continued to make meritless arguments already rejected by the sanctioning court (*see, e.g., Pahl Equip. Corp. v Kassis*, 182 AD2d 22, 32-33, *lv denied in part and dismissed in part* 80 NY2d 1005).

B. SUMMARY JUDGMENT MOTION

1. Reliance Issue

■ PW asserts that the claims of five of the Ackerman plaintiffs—Daliana, Gatewood, Kommitt, Mandala and Slutsky—should be dismissed due to the absence of evidence that they relied on PW's tax advice. PW argues that each of these plaintiffs relied exclusively on their personal accountants. However, as discussed above, the direct professional relationship between the limited partners and PW provided the necessary nexus between PW's alleged malpractice and plaintiffs' injuries. At a minimum, this nexus raised an inference of reliance that alone is a sufficient basis to deny summary judgment. Additionally, questions of fact exist as to whether the warnings in the offering materials negated reasonable reliance by plaintiffs, and whether PW's conduct constituted negligence and malpractice, or, as PW argues, mere honest misjudgment.

2. The Effect of the Settlement in the Federal *Graf* Action

■ PW asserts that the Ackerman plaintiffs' acceptance of the settlement in the *Graf* action entitles it to a setoff of any damages recovered by plaintiffs. The class action complaint filed in the *Graf* action in the Eastern District alleged causes of action in fraud, negligence, breach of fiduciary duty and Federal securities laws violations in connection with the plaintiffs' investment in the CPG partnerships. The damages requested by the plaintiffs were "the amount of their investments, interest payments on the financing notes, plus lost use of the money invested, and consequential damages." Several of the Ackerman plaintiffs were parties to the action.

The *Graf* action was settled by an Amended and Restated Settlement Agreement dated January 18, 1990, and a Final

---

7. We note that there is support in the record for plaintiffs' accusation that this policy was, at a minimum, untimely disclosed during the litigation.

Order and Judgment of Dismissal was signed by District Judge Thomas Platt on February 21, 1990. PW argues that any proceeds received by the plaintiffs in the *Graf* settlement should be set off against any recovery by the plaintiffs in this action pursuant to General Obligations Law § 15-108. PW further asserts that plaintiffs have been made whole by the $40 million settlement in *Graf*, and further recovery regarding the same investment would constitute a double recovery.

General Obligations Law § 15-108 (a) provides that a release given to "one of two or more persons liable or claimed to be liable in tort for the same injury" does not discharge the remaining tortfeasors from liability unless the release expressly says so, "but it reduces the claim of the releasor against the other tortfeasors" by the greater of the amount stipulated or the amount of the released tortfeasor's equitable share of damages. The section only applies where tortfeasors are "liable in tort for the same injury" (*see, Roma v Buffalo Gen. Hosp.*, 103 AD2d 606, 607-608; *see also, Gettner v Getty Oil Co.*, 226 AD2d 502).

The plaintiffs' causes of action in the *Graf* action related solely to initial investment, basically a fraud in the inducement claim. In contrast, the Ackerman plaintiffs' amended complaint raised no fraudulent inducement claim; rather, it relates solely to PW's postinvestment actions regarding the continued use of the Rule of 78's on the CPG partnerships. We agree with the IAS Court that these actions did not seek recovery for the same injury, and therefore General Obligations Law § 15-108 is not applicable.[8] Of course, General Obligations Law § 15-108 has no applicability at all to the contract causes of action.

3. Statute of Limitations Issues

PW argues that some or all of the Ackerman plaintiffs' claims are barred by the applicable Statute of Limitations. First, PW asserts that the 1996 amendment to CPLR 214 (6) (L 1996, ch 623 [eff Sept. 4, 1996]), which clarified that the Statute of Limitations for nonmedical malpractice is three years "regardless of whether the underlying theory is based in contract or tort," is a remedial amendment that should be applied retroactively to claims that accrued prior to its enactment. PW notes that certain legislative memoranda offered in

---

8. While successive tortfeasors are covered by the statute (*Hill v St. Clare's Hosp.*, 67 NY2d 72, 83), PW is not a successive tortfeasor here because the *Ackerman* and *Graf* actions do not seek recovery for the same injury (*Roma v Buffalo Gen. Hosp., supra,* at 608).

support of the legislation indicate that the amendment was designed to remedy the effect of the Court of Appeals decision in *Santulli v Englert, Reilly & McHugh* (78 NY2d 700, *supra*), and to "reaffirm the legislative intent" that the Statute of Limitations for all nonmedical malpractice cases is three years.

We have recently held that the amendment is to be given prospective application only (*see, Ruffolo v Garbarini & Scher*, 239 AD2d 8; *Vogel v Lyman*, 246 AD2d 422; *Amateur Hockey Assn. v Parson*, 244 AD2d 222). The Second and Third Departments are in accord with this view (*see, Board of Mgrs. v Mandel*, 235 AD2d 382 [2d Dept]; *Unadilla Silo Co. v Ernst & Young*, 234 AD2d 754 [3d Dept]). Thus, the six-year Statute of Limitations for contract actions is applicable here.

◼ A second Statute of Limitations issue raised by the parties is whether the doctrine of continuous representation is applicable to this case. It is beyond dispute that the doctrine applies to actions against accountants, and will operate to toll the Statute of Limitations if facts supporting its application exist (*see, Smith Plumbing & Heating Co. v Christensen*, 242 AD2d 429; *Zaref v Berk & Michaels*, 192 AD2d 346). The continuous representation must be in connection with the specific matter directly in dispute, and not merely the continuation of a general professional relationship (*supra,* at 347-348). " 'The mere recurrence of professional services does not constitute continuous representation where the later services performed were not related to the original services' " (*Kearney v Firley, Moran, Freer & Eassa*, 234 AD2d 967, 968, quoting *Hall & Co. v Steiner & Mondore*, 147 AD2d 225, 228-229).

Applying these principles to the instant motion, the branch of PW's motion seeking dismissal on Statute of Limitations grounds was properly denied. The Ackerman plaintiffs provided ample evidence supporting the application of continuous representation, including the repeated use of an improper accounting method and the repeated failure to disclose the risks associated with the same (*see, Zwecker v Kulberg*, 209 AD2d 514, 515 [continuous treatment applicable where limited partners alleged that defendant accountant continued to utilize deductions in preparing their tax returns despite knowledge that IRS would likely invalidate the deduction]). Continuous representation was further demonstrated by PW's representations that it was "handling" the IRS audit for the CPG partnerships. Since PW prepared the Schedules K-1 through 1988, and the Ackerman complaint was filed in April 1990, the claims would be timely under either the six-year Statute of Limitations for

contract actions (CPLR 213 [2]) or the three-year Statute of Limitations for actions involving injury to property (CPLR 214 [4]).

We have examined the parties' remaining contentions and find them to be without merit.

Accordingly, the order of the Supreme Court, New York County (Ira Gammerman, J.), entered November 15, 1994, which denied the Ackerman plaintiffs' motion for class certification, should be affirmed, without costs. Order, same court and Justice, entered April 22, 1997, which denied plaintiffs' renewed motions for class certifications and imposed $5,000 sanctions on the Ackerman plaintiffs' attorneys for frivolous litigation, should be modified, on the law, the facts and in the exercise of discretion, to the extent that the third motion for certification of a class of New York residents only is granted and the sanctions are vacated, and otherwise affirmed, without costs. Order, same court and Justice, entered April 29, 1997, which, to the extent appealed from, denied PW's motion for summary judgment, should be affirmed, without costs.

Tom, J. (concurring). The motion court's orders should be affirmed in their denial of class certification for the "global" (non-New York residents) subclass, but reversed to the extent that the class consists of New York residents. While I concur with Justice Mazzarelli's result, I conclude that additional factors, particularly the burden imposed on New York courts in the absence of a demonstrable New York interest, support this partial affirmance.

Some 1,444 of these putative class members invested in various limited partnerships affiliated with the Commercial Properties Group (CPG) during the 1980's for tax shelters. The investors were advised that as a consequence of their investment, they would be entitled to certain tax benefits realized by accelerating the deduction of interest expenses of loans made to the partnerships. However, the Internal Revenue Services (IRS) subsequent audits of the limited partnerships resulted in findings of tax underpayments by individual plaintiffs, many of whom settled with the IRS, satisfying arrears and paying interest.

The present case, sounding originally in negligence claims and accountant malpractice claims against Price Waterhouse and other defendants, was commenced by the filing of a class action complaint in 1990. After significant motion practice on the Statute of Limitations defense, most of the original com-

plaint was dismissed in December 1994 as untimely. By then, though, plaintiffs had amended the complaint to add two breach of contract claims, and to allege continuous treatment in connection with the still-extant tort and malpractice claims to toll commencement of the Statute of Limitations.

Plaintiffs sought to incorporate into the original class all other limited partners of the CPG partnerships that were audited and penalized by Federal and State tax authorities in connection with the accounting advice by Price Waterhouse concerning the "Rule of 78's". The class has now been defined to include some 1,444 investors in 38 States and four foreign countries. The breakdown of investors by State is as follows: 525 investors are from New York, representing 36% of the proposed class; 192 investors are from Pennsylvania; 130 investors are from Oklahoma; 120 investors are from New Jersey; 80 investors are from Florida; 60 investors are from California; 52 investors are from Washington; 50 investors are from Connecticut; 47 investors are from Virginia; and 188 investors are from 25 more States and four foreign countries.

Justice Gammerman entertained, and ultimately rejected, the Ackerman plaintiffs' class certification efforts in several successive orders.

By motion dated April 30, 1993, the Ackerman plaintiffs moved to certify as a class, for whom Ackerman would serve as class representative, all persons who invested in any of the limited partnerships listed in the attached appendix. The motion court, in an order dated November 16, 1993, denied class certification with leave to renew after discovery of the State of residence of the putative class members. The court noted the geographic diversity of the putative class members, the absence of demonstrable common class issues, especially in view of the diversity of jurisdictions involved, and that for the tort and malpractice claims, State laws varied greatly, further defeating commonality. This order was not appealed.

After the above-noted amendment of the complaint to add breach of contract claims, and after discovery was conducted as to class members' residences (providing the class composition noted above), the application for class certification was renewed in March 1994. In its November 15, 1994 order, the court again denied certification. The court noted that plaintiffs claimed damages for both Federal and State tax assessment and penalties, claims that were made not only under the tax laws of the United States but also pursuant to the statutory and administrative schemes of 38 different States, and that Price Water-

house was entitled to scrutinize the validity of all such tax rulings. Justice Gammerman again noted the significant conflicts of law issues, now also including diverse State treatments of the contract claims. The court also noted that different States utilized different laws of waiver and estoppel in connection with Statutes of Limitation. This order was appealed, and presently is under review.

Plaintiffs, despite a warning from the court that another renewal might elicit sanctions, renewed the motion in June 1995 and again in August 1995. The June 1995 motion sought certification for investors who were New York residents, bifurcated between contract and tort claims. The August 1995 motion sought certification for all non-New York investors and argued for the application of Pennsylvania law to the contract claims. The court denied both motions and imposed sanctions in its April 22, 1997 order, also presently under review, finding that for all claims, the law of each investor's forum likely would apply, so that the original factors militating against certification still remained. Specifically with respect to the non-New York "global" class, the court rejected the plaintiffs' position that Pennsylvania law would govern the contract claims, but also found that Pennsylvania's restrictiveness on accountant malpractice claims, requiring proof of reliance, actually was contrary to the best interests of the class and that the allegations of the complaint might not even make out contract claims under Pennsylvania law. The court also found that the tort claims raised on behalf of the global class would require analysis of the laws of dozens of States, making resolution of those claims in a single forum unmanageable.

CPLR article 9 sets forth five criteria, comprehensively analyzed in Justice Mazzarelli's opinion, that basically seek to balance the competing complexities and benefits of litigating the claims individually, perhaps in diverse forums, and litigating the claims together in a single forum. These criteria, though, basically require an evaluation of the burdens on the respective parties, and are less than clear on how to factor in the burden on the host forum. As a practical matter, many certification proceedings litigated in New York have addressed New York-accrued claims or New York residents seeking relief, and usually both (*see, e.g., Weinberg v Hertz Corp.*, 116 AD2d 1, *affd* 69 NY2d 979, certifying a class of persons renting cars in New York asserting violation of General Business Law § 349, when a similar class consisting of California residents and renters within California, suing under California law, was

recognized by that State [*Lazar v Hertz Corp.*, 143 Cal App 3d 128, 191 Cal Rptr 849; *accord, Super Glue Corp. v Avis Rent A Car Sys.*, 132 AD2d 604]). To the extent that plaintiffs now seek to certify a non-New York subclass, though, the present case presents circumstances less typical of State court certification proceedings and warrants greater scrutiny of the sum benefits as contrasted with complexity and cost to the host forum.

Certifying a non-New York subclass to litigate the tort issues, in which the law of each State of residence would be invoked despite the absence of a New York interest, clearly would impose unreasonable burdens on our courts (*see generally*, Zabel and Eyres, *Conflict-of-Law Issues in Multistate Product Liability Class Actions*, 19 Hamline L Rev 429 [1996]). As to the tort claims, we all agree that for this reason, certification should not be granted.

As to the global class certification on the contract claims, similar reasoning should apply. In addition to the majority's trenchant analysis of the statutory criteria, there is an additional question which, under these facts, I think is important: why should the courts of New York be burdened with a massive class of non-New York residents (919 parties) from some 37 foreign States and numerous foreign nations, all of whom lack any significant connection with New York regarding the matter in litigation? As to these contract claims, it seems to me to be a critical consideration that all major events occurred in Pennsylvania rather than New York. The contract between CPG and Price Waterhouse was negotiated and entered into in Pennsylvania; all relevant tax preparation work was completed in Price Waterhouse's Philadelphia office; the partnership returns and schedules were delivered to CPG in Pennsylvania and then sent to the parties at their out-of-State places of residence; CPG was organized under the laws of Pennsylvania, and the various partnership agreements provided for application of Pennsylvania law. Once New York residents are excluded from the class, almost all New York contacts also are removed. One must question what possible interest New York has in resolution of those claims. I would conclude that the manifest lack of any New York interest in resolution of the non-New York parties' contract claims, especially when balanced against the burden to be imposed on our courts, provided an ample basis for the exercise of discretion to deny certification. The natural question is why certification was not sought in a State where non-New York claims are clustered.

The administrative burden on our courts will be enormous, with no sum benefits to the residents of our State, resolving legal claims for which New York interest is lacking. At present, the conflicts issue remains unresolved. If further litigation results in a more eclectic approach to these contract claims, numerous hearings will be required on the applicability and requirements of numerous State laws and defenses. The damages of each class member will have to be individually proved. Although this, by itself, likewise would not require denial of class certification, this underscores the hydra-like nature of the putative non-New York class and the excessive burdens that our courts will assume in furtherance of nonresidents asserting claims arising outside of the State. Moreover, the damage claims for each class member, rather then being marginal, as is more typical of class actions and which provides one rationale for certification of a class, tend to be substantial in this case. While this factor by itself might not be dispositive, it further places in doubt the efficacy of certifying this subclass and litigating the matter in New York. Multiple rulings will be necessary to sort out the applicability of the respective Statutes of Limitation and when time periods accrue for each class member. Particularly for the Statutes of Limitation of these numerous States, issues of waiver and estoppel from pleading the defense likely will require litigation. Litigation regarding defenses to contractual liability, and methods of proving damages, whether for a single foreign forum or for numerous foreign forums, in addition to enhancing the predominance of individual claims as noted by the majority, only adds to New York's litigation burden in this case. Further, to the extent that individual damage awards require an evaluation of particular State tax laws, additional litigation will be necessary to sort out the particular claims, ascertain the applicability of foreign tax laws, evaluate the validity of any foreign tax assessments, and measure damages, potentially employing numerous mini-trials on tax issues alone. Even if some of these many issues ultimately are resolved without undue commitment of judicial resources, the aggregate effect still threatens to impose on our courts an enormous litigation burden for matters that New York has scant, if any, interest.

Finally, it is well established that the findings of the motion court in ruling on proposed class certifications are to be accorded substantial deference (*Matter of Colt Indus. Shareholder Litig.*, 155 AD2d 154, 159, *mod* 77 NY2d 185). In this case, we should accord that deference with respect to ruling concerning the non-New York plaintiffs.

ELLERIN, J. P., RUBIN and ANDRIAS, JJ., concur with MAZZARELLI, J.; TOM, J., concurs in a separate opinion.

Order, Supreme Court, New York County, entered November 15, 1994, affirmed, without costs; order, same court and Justice, entered April 22, 1997, modified, on the law, the facts and in the exercise of discretion, to the extent that the third motion for certification of a class of New York residents only is granted and the sanctions vacated, and otherwise affirmed, without costs; order, same court and Justice, entered April 29, 1997, affirmed, without costs.