[No. 10961-5-III.   Division Three.   February 25, 1992.]

SEATTLE-FIRST NATIONAL BANK, N.A., *Respondent*, v. JAMES R. SIEBOL, ET AL, *Appellants*.

*John J. Carroll, John S. Moore,* and *Velikanje, Moore & Shore Inc. P.S.,* for appellants.

*Don W. Schussler* and *Halverson & Applegate, P.S.,* for respondent.

SHIELDS, C.J. — Seattle First National Bank (Seafirst) instituted foreclosure proceedings to recover on secured loans it made to James R. and Patricia D. Siebol. After a bench trial, the court entered judgment for Seafirst in the amount of $431,858.49 plus interest, $50,000 in attorney fees, $106.20 in costs, and foreclosed the deeds of trust securing the debt. However, the court granted the Siebols an offset of $34,364 in damages resulting from Mr. Siebol's detrimental reliance on the bank's promise to provide financing for lot improvement and purchase of inventory for a new business venture. The Siebols appeal the amount of the offset and the award of attorney fees; the bank cross-appeals the award of the offset and its amount. We affirm.

Late in 1982, Mr. Siebol decided to reenter the used car business in Yakima.[1] His assets consisted of the Pourhouse Tavern in Yakima, a seller's contract on the Caribou Motel in Oroville, a Circle-L gas station/minimart in Sunnyside and adjacent 6- and 60-acre ranches in the Yakima area. He later acquired a contract on a 35-acre leased orchard.

Mr. Siebol had banked with Seafirst since 1977 and loan officer Terry Wheat had been handling his accounts since April 1982. In January 1983, Mr. Siebol met with Mr. Wheat to discuss financing for his proposed dealership. Mr. Siebol represented he would need $50,000 for improvements to the lot he planned to lease and $250,000 for used car inventory. There are variations in the testimony of both Mr. Wheat and Mr. Siebol regarding the total amount the bank

---

[1] Mr. Siebol operated a used car lot in Union Gap during the 1960's and had maintained his license ever since, keeping a few used cars for sale at a Circle-L gas station/minimart he owned.

would loan Mr. Siebol; however, the two pages of the bank's records which possibly could resolve the issue are missing. The court found Mr. Wheat represented to Mr. Siebol that he could obtain loans for him in those amounts, either as flooring and/or a line of credit,[2] and that those loans would be in addition to approximately $117,000 which Mr. Siebol owed the bank at that time. Relying on Mr. Wheat's assurances, Mr. Siebol proceeded with necessary lot improvements and opened his used car business in April 1983.

At approximately the same time, Mr. Wheat submitted a flooring plan to the bank department in Seattle which handled that type of financing. On April 18, 1983, Mr. Siebol signed a master note for a credit line not to exceed $244,000, including the existing $117,799.77 debt which was rolled over into the note. As security, the bank took an assignment of the Caribou Motel contract and deed, and a first mortgage on the Pourhouse Tavern.

After the car lot opened, Mr. Wheat informed Mr. Siebol the bank would not floor his used car inventory, nor would it extend an additional line of credit. Although Mr. Wheat indicated he would continue trying to obtain financing for him, the court found Mr. Siebol knew in May 1983 he would not be receiving the entire amount promised for lot improvement and used car inventory. The court further found Mr. Siebol received an additional $115,000 through advances used to cover overdrafts,[3] for a total of $359,000. "In effect, [Mr. Siebol] never received $58,000.00 of the funds [$417,000] he believed were to be made available to him in April, 1983", and which he reasonably anticipated.

On April 16, 1984, Mr. Siebol's $244,000 credit line and overdrafts were rolled over into a new secured $309,000 note and a new unsecured $50,000 note. Payments on the secured

---

[2]The local branch could not approve dealer flooring, but could approve a line of credit. The finding implies the loan was not contingent on flooring approval.

[3]Mr. Siebol was permitted to overdraft his account as an interim form of financing the purchase of additional inventory while Mr. Wheat tried to arrange additional funding.

note were amortized on a 15-year schedule subject to an annual review, but the note was technically due in 1 year. Additional security was taken in the form of a second mortgage on the Circle-L gas station/minimart and an assignment of the Circle-L lease proceeds. Ultimately, Seafirst held a security interest in all of the Siebols' real property.

From July 1987, Mr. Siebol was unable to make his loan payments to Seafirst. In October, Seafirst supervisory personnel in Spokane directed Mr. Wheat to make written demand on the Siebols for payment of the $378,312.12 then owed plus $10,338.70 in interest. Mr. Wheat did so by letter dated October 16, 1987, demanding payment in full by October 22. Seafirst filed a summons and complaint for foreclosure on November 24. The Siebols counterclaimed for damages, including lost profits, allegedly resulting from the bank's breach of its oral promise to provide $300,000 in improvement and inventory financing. They also asserted the breach as an affirmative defense.

The case was tried October 9 to 11, 1989, with additional proceedings on the issue of damages on November 1, 1989, and January 2, 1990. The Siebols did not challenge the foreclosure, which the court granted. Most of the trial involved the Siebols' counterclaim and affirmative defense. The court ruled the counterclaim for affirmative relief was barred by the statute of limitation, but granted an equitable setoff on the affirmative defense for lost profits on a theory of promissory estoppel. The court limited recoupment of lost profits to the first year of operation because the extension of credit would have been reviewable at the end of that period and the bank could have refused to renew it.

Four issues are presented by the appeal and cross appeal:

1. Whether Mr. Wheat's ongoing efforts to obtain additional financing for the Siebols tolled the statute of limitation on their counterclaim under the continuing relationship doctrine;

2. Whether the court's equitable offset based upon a theory of promissory estoppel was appropriate;

3. Whether the court erred in awarding the Siebols $34,364 for lost profits; and

4. Whether the court erred in awarding attorney fees to the bank.

## SIEBOLS' COUNTERCLAIM

The bank started foreclosure proceedings on November 24, 1987. On January 11, 1988, the Siebols asserted their counterclaim based on the bank's alleged breach of an oral promise to provide inventory financing. The bank argued the statute of limitation barred the counterclaim; the court agreed. The Siebols concede the 3-year limitation in RCW 4.16.080 applies to the counterclaim because Mr. Siebol knew in May 1983 the financing originally promised was not forthcoming. However, they seek an affirmative judgment exceeding Seafirst's claim, contending they fit within the "continuous relationship" doctrine which tolls the statute of limitation until the relationship between the parties is terminated. *Hermann v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 17 Wn. App. 626, 564 P.2d 817 (1977)[4] and cases from other jurisdictions.

Washington cases do not directly address the continuing relationship doctrine. Other jurisdictions have held it applies to doctors, attorneys, dentists, architects, accountants, surveyors, executors and investment advisers when the professional relationship is a continuing one. The purpose of the

---

[4]In *Hermann*, the plaintiffs argued the 3-year statute of limitation on their claim against a stockbroker for negligence and mishandling of their accounts was tolled and did not begin to run until the date the relationship between the parties was terminated, premised on the fact the relationship between the parties was a continuing one. *Hermann*, at 628. Without comment on the continuing relationship doctrine, *Hermann* held at page 630:

> The determination of the exact date that the plaintiffs discovered the defendants' wrongdoing, or in the exercise of reasonable care should have discovered such wrongdoing, is a factual question for determination by the jury and, *likewise, if there is evidence to support plaintiffs' claim that the relationship was a continuing one so that the statute is tolled until the relationship is terminated, is also a factual question to be submitted to the jury on proper instructions.*

(Italics ours.)

doctrine is discussed in *Greene v. Greene*, 56 N.Y.2d 86, 436 N.E.2d 496, 451 N.Y.S.2d 46 (1982). *Greene*, at 94, notes the doctrine was first recognized in medical malpractice cases, then extended to other professionals and also applied to equitable claims:

> In a broader sense the rule recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered.

(Citation omitted.)

■ The Siebols argue the ongoing relationship in this case fits within the purpose of the doctrine. The *Hermann* case applied the discovery rule to allegations of stockbroker malpractice and seemed to accept, without explanation or elaboration, that a continuing relationship could toll the statute of limitation. *See Hermann*, at 628, 630. It did not involve bank loans. Nor do we find any cases from other jurisdictions which have applied the doctrine to a situation involving a commercial bank loan officer and a customer. We decline the invitation to adopt or extend the doctrine to these facts.

### AFFIRMATIVE DEFENSE

■ The Siebols also raised the bank's alleged breach of an oral promise as an affirmative defense. Statutes of limitation never run against defenses arising out of the transactions sued upon. *Allis-Chalmers Corp. v. North Bonneville*, 113 Wn.2d 108, 112, 775 P.2d 953 (1989). One such defense, recoupment, is not barred by the statute of limitation so long as the main action itself is timely. 51 Am. Jur. 2d *Limitation of Actions* § 77, at 656 (1970). The defense goes to the justice of the plaintiff's claim, and although no affirmative judgment can be had, recoupment is available as a defense even when barred as an affirmative cause of action. 20 Am. Jur. 2d *Counterclaim, Recoupment, and Setoff* §§ 10, 11, at 235-36 (1965).

■ Here, the court rejected the Siebols' suggestion Mr. Wheat's oral promise constituted a contract to lend money,[5] but found the bank answerable on a theory of promissory estoppel.

> Promissory estoppel requires five elements:
>
> (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

*Farm Crop Energy, Inc. v. Old Nat'l Bank of Wash.*, 38 Wn. App. 50, 52, 685 P.2d 1097 (1984) (quoting *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967)), *rev'd on other grounds*, 109 Wn.2d 923, 750 P.2d 231 (1988).

■ The court's findings of fact upon which the equitable remedy is based are supported by substantial evidence. The findings support the court's conclusion an equitable offset is warranted on the basis of promissory estoppel. Mr. Wheat's representations constituted a promise upon which he knew Mr. Siebol was relying. Mr. Siebol leased a lot and spent $60,000 on improvements based on the oral loan commitment; he would not have borrowed money from Seafirst to open a new business had it not promised to finance his used car inventory. Based on the parties' agreement and his previous course of dealings with the bank, Mr. Siebol's change of position was justified and it would be unjust not to enforce the promise.

## LOST PROFITS

■ Lost profits are recoverable in promissory estoppel cases as long as there is a substantial and sufficient factual basis supporting the amount awarded. That the business is new does not preclude recovery for lost profits if they may be reasonably estimated through market condition analysis of similar, but profitable, businesses in the vicinity, operating under substantially the same conditions. *Farm Crop*

---

[5]Seafirst's arguments the court should have concluded the alleged oral contract failed for lack of certainty are, therefore, pointless.

*Energy*, 109 Wn.2d at 927-28; *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 11, 19, 390 P.2d 677, 396 P.2d 879 (1964).

Here, the Siebols' expert provided a framework using Mr. Siebol's actual losses and national industry averages, while Seafirst's expert provided details regarding local businesses. Both experts are certified public accountants who used similar methods: one arrived at a figure of $65,000, and the other, a figure of $20,400. In the end, the court fashioned an equitable remedy.[6] The court's award is between the projections of the two experts; we will not disturb it.

The court's decision to limit damages to 1 year is supported by its finding the extension of credit would have been nonrevolving and reviewable at the end of the first year. Substantial evidence supports the finding. The court's remedy is equitable, which is the goal in a promissory estoppel case.

### ATTORNEY FEES

█ The Siebols contend Seafirst should not have been awarded attorney fees because most of the trial focused on their counterclaim and affirmative defense, and the amount of the equitable offset awarded as recoupment. They argue Seafirst was not the prevailing party on the issue of promissory estoppel: it did not improve its position at trial and had an offset judgment entered against it. The argument is without merit. Attorney fees may be awarded only when authorized by a private agreement, statute, or a recognized ground of equity. *Clark v. Horse Racing Comm'n*, 106 Wn.2d 84, 720 P.2d 831 (1986). Pursuant to RCW 4.84.330, the prevailing party in an action to enforce or defend a contract is entitled to attorney fees and costs when the contract so provides. Seafirst sued to collect under the terms of the Siebols' promissory notes, mortgages, security interests, and deeds of trust. Those documents expressly provide for costs of collection including attorney fees. The award of an

---

[6]The court did not find a breach of a contract to lend money, thus contract cases limiting damages to expenses associated with making another loan do not apply. See footnote 5 and associated text. Furthermore, the Siebols were unable to obtain inventory financing elsewhere due to the concentrated debt at Seafirst.

410

equitable offset does not make the Siebols a prevailing party entitled to fees under RCW 4.84.330.

The judgment of the trial court is affirmed.

THOMPSON, J., and STAUFFACHER, J. Pro Tem., concur.

Review denied at 119 Wn.2d 1010 (1992).