[No. 55824-2-I.   Division One.   September 25, 2006.]

DENNIS BURNS, *Individually and as a Partner, Appellant*, v. DAVID B. MCCLINTON ET AL., *Respondents*.

---

[50] *State v. Williams*, 132 Wn.2d 248, 254, 937 P.2d 1052 (1997) (quoting *State v. Cleveland*, 58 Wn. App. 634, 639, 794 P.2d 546 (1990)).

288

*Jerry H. Kindinger, Robin A. Schachter,* and *Robert R. King* (of *Ryan Swanson Cleveland, P.L.L.C.*), for appellant.

*Robert B. Gould* and *Brian J. Waid* (of *Law Office of Robert B. Gould*), for respondents.

¶1 BECKER, J. — For many years, Dennis Burns, a wealthy inventor and investor, used the professional accounting services of David McClinton. Burns gave McClinton carte blanche over his personal finances in 1995. They orally agreed to an indefinite retainer agreement pegging McClinton's monthly fee at $1,500. Burns fired McClinton in 2001 after discovering that McClinton had long been paying himself at the rate of $2,500 per month, as well as additional sums for special projects. Burns sued McClinton, and the trial court found that Burns had not agreed to the fee increase. The court awarded him damages covering six years of breach.

¶2 The primary issue is whether the trial court erred in tolling the three-year statute of limitations for an action upon an oral contract. The trial court's ruling was based upon an extension of the "continuous representation" rule that may toll the statute of limitations in an action alleging professional wrongdoing in a particular matter. Holding that the continuous representation rule does not apply to a fee dispute arising out of an ongoing professional relationship, we reverse this ruling. We also reverse the conclusion

that McClinton's transfer of the unauthorized fees to himself was a violation of the Consumer Protection Act, chapter 19.86 RCW. There is insufficient evidence that McClinton's conduct had the capacity to deceive a substantial portion of the public.

## FEE OVERCHARGES

¶3 According to unchallenged findings of fact entered after a seven-day bench trial, Burns first hired McClinton, a certified public accountant, in 1985. McClinton did tax work for corporations owned by Burns. He was the only accountant Burns had ever hired. In 1995, when Burns sold portions of his companies, he hired McClinton to handle his personal finances. Burns orally agreed to pay McClinton $1,500 per month.

¶4 As the accounting workload for the Burns interests increased, McClinton developed a complex series of accounts that he and Burns could both control. Burns authorized McClinton to pay himself for his accounting work by writing checks on some of Burns's accounts. McClinton began to pay himself extra for what he called "special projects," outside the realm of routine bookkeeping matters. He did not make Burns aware of this practice, and the court found there was no meeting of the minds with respect to these extra charges.

¶5 Burns and McClinton met and spoke frequently and often discussed aspects of Burns' financial circumstances. McClinton provided a "barrage" of information to Burns in the form of various financial reports that were hundreds of pages long. McClinton, however, knew that Burns was a "big picture guy" who preferred to delegate the financial details of his operations, wanted only generalized financial information, and would not closely review detailed financial reports. Burns trusted McClinton, as his longtime accountant and friend, to act in his best interest and according to his instructions.

¶6 In October 1996, McClinton began to pay himself $2,500 per month, an increase of $1,000 per month above what they had originally agreed to. McClinton testified at trial that Burns met with him in 1996 and orally agreed to the increase. Burns denied this, and the trial court found that the meeting and the agreement to increase the monthly fee "did not occur."

¶7 In May 2001, Burns asked McClinton to compile a summary of his accounting fees. The summary McClinton provided revealed the increase in the monthly fee McClinton had been paying to himself and led to a very brief and uncomfortable conversation between the two men. Eventually, Burns fired McClinton and hired an accounting firm to engage in a forensic accounting and to handle his finances. The firm's audit showed that McClinton's overcharges totaled $87,107 since October 1996.

¶8 Burns sued McClinton in March 2003 for the overages as well as several other claims. He alleged that McClinton's excess billing constituted breach of contract, breach of fiduciary duty, and accounting malpractice. McClinton invoked the three-year statute of limitations as a defense. The trial court concluded that the claims for overcharges occurring before March 2000 were not time-barred. The court awarded Burns damages for McClinton's breach of the oral contract in the full amount claimed over the six year period, $87,107. McClinton appeals.

## STATUTE OF LIMITATIONS

¶9 McClinton contends that the proper application of the three-year statute of limitations calls for the judgment against him to be reduced to $15,000, the total for overcharges occurring during the three years before Burns filed the complaint.

¶10 The three-year statute of limitations applies to an action upon a contract which is not in writing. RCW 4.16.080(3). Actions can only be commenced within the time periods specified in chapter 4.16 RCW "after the cause of

action has accrued." RCW 4.16.005. A cause of action accrues when the plaintiff has a right to seek relief in the courts. *Janicki Logging & Constr. Co. v. Schwabe, Williamson & Wyatt, P.C.*, 109 Wn. App. 655, 659, 37 P.3d 309 (2001). The purpose of statutes of limitations is to shield defendants and the judicial system from stale claims. When plaintiffs sleep on their rights, evidence may be lost and memories may fade. *Crisman v. Crisman*, 85 Wn. App. 15, 19, 931 P.2d 163 (1997).

¶11 Below, Burns argued that the statute of limitations was tolled in two distinct ways—by the discovery rule and by the continuous representation rule. Under the discovery rule, the statute of limitations does not start to run on an attorney malpractice claim until the client discovers, or in the exercise of reasonable diligence should have discovered, the facts giving rise to the cause of action. *Janicki*, 109 Wn. App. at 658. Under the continuous representation rule, "the statute of limitations on an attorney malpractice claim is tolled during an attorney's continuous representation of the client in the same matter from which the malpractice claim arose." *Janicki*, 109 Wn. App. at 658.

¶12 The trial court did not apply the discovery rule. The court did, however, conclude that the continuous representation rule tolled the three year statute on a claim for breach of an oral contract, RCW 4.16.080. The court ruled "the continuous representation rule applies in that the work performed was part of an ongoing engagement to provide certain accounting services for a fee."

¶13 McClinton contends the continuous representation rule does not toll the statute of limitations on the breach of contract claims because there was no claim of error in a specific accounting assignment that required further accounting work to be completed before the claim accrued.

¶14 The continuous representation rule was first adopted in this state by *Janicki* in the context of an attorney malpractice lawsuit. Other jurisdictions have applied the continuous representation rule to toll the statute of limitations on claims of accounting malpractice as well. *See, e.g.,*

*Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179, 197 (1998) ("It is beyond dispute that the doctrine applies to actions against accountants."); *Zaref v. Berk & Michaels, P.C.*, 192 A.D.2d 346, 595 N.Y.S.2d 772 (1993).

¶15 The evolution of the continuous representation rule in attorney malpractice cases is discussed in 3 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 22.13, at 370-73 (2006). New York courts initially identified the doctrine as continuous "treatment," recognizing its medical malpractice origins. According to Mallen and Smith, "continuous representation" is the more appropriate and more recent reference, and the representation must be with regard to a particular matter:

> The premise is that the "cause of action in an attorney malpractice case should not accrue *until the attorney's representation concerning a particular transaction is terminated.*" The application of the rule to specific facts should be based on whether any of the policy considerations is furthered.
>
> The purpose of the continuous representation rule is to avoid disrupting the attorney-client relationship unnecessarily. Adoption of the rule was a direct reaction to the illogical requirement of the occurrence rule, which compels clients to sue their attorneys though the relationship continues, and there has not been and may never be any injury. The continuous representation rule is consistent with the purpose of the statute of limitations, which is to prevent stale claims and enable the defendant to preserve evidence. *When the attorney continues to represent the client in the subject matter in which the error has occurred,* all such objectives are achieved and preserved. The attorney-client relationship is maintained and speculative malpractice litigation is avoided.

MALLEN & SMITH, *supra*, § 22.13, at 372 (emphasis added) (footnotes omitted) (quoting *Grago v. Robertson*, 49 A.D.2d 645, 370 N.Y.S.2d 255, 259 (1975)).

¶16 "The doctrine is not limited to litigation, nor does it matter whether the theory of liability sounds in tort or contract." MALLEN & SMITH, *supra*, § 22.13, at 373. Here, the trial court concluded McClinton's undisclosed fee increases

not only breached the oral agreement he made with Burns but also were tortious:

> Mr. McClinton violated the standard of care of a [certified public accountant] in the State of Washington and the enhanced duty of a fiduciary in the following respects: failing to obtain Mr. Burns' informed authorization to an increase in fees and to fees for special projects, failing to create monthly statements that accurately described the work performed, and failing to disclose in a form understandable to his client, the nature and amount of fees he was regularly paying himself from the client's funds.

The continuous representation rule could, in proper circumstances, toll the statute of limitations on all three of the claims asserted by Burns: breach of an oral contract, malpractice, and breach of a fiduciary duty. However, we conclude that the ongoing professional relationship during which McClinton's overcharging occurred is not an appropriate situation for application of the rule.

¶17 The evolution of the continuous representation rule in this state has been similar to the course described in the treatise by Mallen and Smith. A harbinger of the rule is found in a stockbroker negligence case, *Hermann v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 17 Wn. App. 626, 630 n.4, 564 P.2d 817 (1977). The court held not only that the application of the discovery rule was a factual question but also stated, without analysis, "likewise, if there is evidence to support *plaintiffs' claim that the relationship was a continuing one so that the statute is tolled until the relationship is terminated,* is also a factual question to be submitted to the jury on proper instructions." *Hermann,* 17 Wn. App. at 630 (emphasis added).

¶18 The issue of tolling based on a "continuing relationship" arose again in a foreclosure action, *Seattle-First Nat'l Bank, N.A. v. Siebol,* 64 Wn. App. 401, 406-07, 824 P.2d 1252 (1992). The defendants counterclaimed for damages based on an allegation that the bank, five years before initiating foreclosure, had breached an oral promise to provide inventory financing. The defendants asserted that

their continuing relationship with the bank tolled the three-year statute of limitations until their relationship with the bank had terminated. The court acknowledged the continuing relationship doctrine as having originated in medical malpractice cases, as having since been extended in the context of other professions, and as having been implicitly applied in *Hermann*. The court nevertheless decided against applying it to a situation involving a commercial bank loan officer and a customer. *Siebol*, 64 Wn. App. at 407.

¶19 As discussed in *Siebol* and *Hermann*, the continuing relationship rule appears to require only a continuing relationship as a predicate for tolling the statute of limitations until the relationship terminates. In this case, the trial court's conclusion of law is couched in terms of a continuing professional relationship: "the work performed was part of an ongoing engagement to provide certain accounting services for a fee." But the articulation of the continuing relationship rule in *Siebol*, a case where it was neither adopted nor applied, is not the same as the continuous representation rule that actually has been adopted in Washington as a basis for tolling the statute of limitations. *Janicki*, the first Washington decision to adopt and apply the continuous representation rule, carefully distinguished it from the continuing relationship rule discussed in *Hermann* and *Siebol*. Most importantly, "the rule as applied to attorneys does not toll the statute until the end of the attorney-client *relationship*, but only until the end of the attorney's representation of the client in the same matter in which the alleged malpractice occurred." *Janicki*, 109 Wn. App. at 661 n.1. Recently, this court rejected a proposal to expand the scope of the rule to apply to an attorney's ongoing representation as a whole. Expanding the rule "would conflict with our rationale for adopting the rule in the first place. The purpose of the rule is to give attorneys an opportunity to remedy their errors, establish that there was no error, or attempt to mitigate the damage caused by their errors, while still allowing the aggrieved

client the right to later bring a malpractice action." *Cawdrey v. Hanson Baker Ludlow Drumheller, P.S.*, 129 Wn. App. 810, 819, 102 P.3d 605 (2005).

¶20 The limitation of the rule in *Janicki* and *Cawdrey* to representation in specific matters is consistent with the treatment of the rule by Mallen and Smith. They identify the continuous representation rule, with its limitation to "representation concerning a particular transaction," as the doctrine appropriately used to toll the statute of limitations in a legal malpractice case. The continuous representation rule helps avoid disruption of the professional relationship and gives the professional the chance to remedy mistakes before being sued. The rule also prevents a professional from defeating a malpractice claim by continuing represen- tation until the statute of limitations has expired. And it helps avoid speculative malpractice litigation. *Janicki*, 109 Wn. App. at 662. In short, the rule is "fair to all concerned parties":

> The attorney has the opportunity to remedy, avoid or establish that there was no error, or attempt to mitigate the damages. The client is not forced to end the relationship, though the option exists. This result is consistent with all expressed policy bases for the statute of limitations.

MALLEN & SMITH, *supra*, § 22.13, at 373 (footnotes omitted); *see also Janicki*, 109 Wn. App. at 663 (quoting same language from 2000 edition of treatise).

¶21 Courts that have considered the continuous represen- tation rule in the context of accounting malpractice have similarly held that the plaintiff must show continuous rep- resentation by the accountant with respect to "the specific matter directly in dispute, and not merely the continuation of a general professional relationship." *Ackerman*, 683 N.Y.S.2d at 197. *See also Zaref*, 595 N.Y.S.2d at 774 ("the pleading must assert more than simply an extended general relation- ship between the professional and client in that the facts are required to demonstrate continued representation in the specific matter directly under dispute" (citation omitted)).

¶22  *Janicki* and *Ackerman* illustrate what is meant by a "specific matter" directly in dispute. A court dismissed Janicki's underlying lawsuit with prejudice on the basis that it was not timely filed. Janicki's lawyers continued to represent him through five years of unsuccessful appeals of the dismissal. When Janicki then sued his lawyers for filing the suit too late, they raised the three-year statute of limitations as an affirmative defense. The court held the cause of action for malpractice did not accrue until the end of the law firm's representation of Janicki in that appeals process—the specific matter in which the lawyers were attempting to cure any professional negligence. Similarly, in *Ackerman*, the client alleged that an accounting firm had repeatedly used an improper accounting method and failed to disclose to the client the risks associated with that method. When the Internal Revenue Service began to scrutinize that method, the firm agreed to serve the client through the audit process and represented that it was "handling" the problem. The outcome, however, was unfavorable to the client. A malpractice suit ensued, to which the accounting firm raised the statute of limitations as a defense. The New York court found "ample evidence" of continuous representation in the matter in dispute and held that the firm's motion to dismiss based on the statute of limitations was properly denied. *Ackerman*, 683 N.Y.S.2d at 197. *See also Wynn v. Estate of Holmes*, 1991 OK CIV APP 78, 815 P.2d 1231, 1235 ("accountant Holmes had undertaken to represent the plaintiffs in getting the matter straightened out," and his advice would lead the plaintiffs to believe the Internal Revenue Service was not going to assess interest on an underpayment of tax). By contrast, in *Cawdrey* the court concluded that an attorney malpractice complaint was untimely even though filed less than three years after the termination of the relationship. While the lawyer had continuously represented her client in a variety of matters, including estate planning, her representation in the specific transaction at issue—structuring a partnership buyout—had ended long before.

¶23 Burns did not allege that McClinton breached their contract by failing to provide adequate accounting services or letting him down in any particular matter. However styled, the claim by Burns arose out of McClinton's charging him more than they had agreed for accounting services. The wrong occurred during the general course of an ongoing professional relationship, not in continued representation with respect to a particular undertaking or specific transaction in which McClinton had committed a professional error. Burns did not have to choose between engaging in speculative litigation and waiting to see if things might turn out all right after all in some specific matter, as in *Janicki* and *Ackerman*. Burns remained unaware for years that McClinton had raised his fees, but as soon as he found out about it, he took the position that the fee increases were unauthorized and demanded repayment. There was nothing McClinton could have done in an ongoing professional capacity, that is, as the representative of Burns in any particular matter, to make the situation turn out better for Burns. McClinton could either pay Burns back or not. When McClinton refused to make repayment, Burns sued him.

¶24 This case thus does not resemble those cases in which the continuous representation rule has been held to apply. There is no distinct accounting matter that justifies applying the rule. The trial court's decision to toll the statute of limitations based on the continuous representation rule must be reversed.

¶25 In the alternative, Burns asks us to affirm the judgment on the ground that the discovery rule applies. The discovery rule tolls the date of accrual until the plaintiff "knows or, through the exercise of due diligence, should have known all the facts necessary to establish a legal claim." *Crisman*, 85 Wn. App. at 20. The discovery rule can apply when a defendant has fraudulently concealed a material fact from a plaintiff, depriving the plaintiff of the knowledge of the accrual of the cause of action. It can also apply where the nature of the plaintiff's injury makes it extremely difficult for the plaintiff to learn the factual

elements of the cause of action. *Crisman*, 85 Wn. App. at 20-21. It is an available argument in breach of contract claims as well as tort claims. *Wm. Dickson Co. v. Pierce County*, 128 Wn. App. 488, 495-96, 116 P.3d 409 (2005).

¶26 The question of due diligence, with respect to the discovery rule, is a question of fact unless reasonable minds could reach but one conclusion. *Allen v. State*, 118 Wn.2d 753, 760, 826 P.2d 200 (1992). The plaintiff bears the burden of proving that the necessary facts could not be discovered in time. *Douglass v. Stanger*, 101 Wn. App. 243, 256, 2 P.3d 998 (2000).

¶27 The trial court found that "None of the checks or invoices to Mr. McClinton was ever brought to Mr. Burns' attention and Mr. Burns did not become aware of the fee increase or the separate billing for special projects until May 2001." The court also found that McClinton, knowing that Burns was a "big picture guy," developed a complex series of accounts and provided Burns with a "barrage" of information. The court did not, however, make a finding that Burns could not have discovered the overcharges earlier through the exercise of due diligence. The lack of this finding is fatal. Absent an express finding upon a material fact, it is deemed to have been found against the party having the burden of proof. *Interlake Porsche + Audi, Inc. v. Bucholz*, 45 Wn. App. 502, 518, 728 P.2d 597 (1986). Burns failed to carry his burden of proving that he could not have known about the overcharges earlier.

¶28 Burns contends that application of the discovery rule is the only legal conclusion consistent with the court's unchallenged findings. We disagree. McClinton vigorously argued below that Burns showed a lack of due diligence by failing to read and comprehend the financial reports McClinton provided to him. The findings entered by the trial court are not inconsistent with this argument. Because Burns did not succeed at the trial level in establishing facts necessary to support application of the discovery rule, the discovery rule is not available as an alternative ground

upon which to affirm the court's decision to toll the statute of limitations.

¶29 Another alternative theory offered by Burns to support the court's ruling is that the fee increases were voidable under *Ward v. Richards & Rossano, Inc.*, 51 Wn. App. 423, 428-29, 754 P.2d 120 (1988). Under review in that case was a 40 percent contingent fee agreement in a personal injury action. The attorneys who obtained a sizable judgment at trial insisted on increasing the percentage to 50 percent when it became necessary to defend the judgment on appeal. After the judgment was affirmed on appeal, the clients filed a complaint contesting the validity of the modified fee agreement. A summary judgment in favor of the attorneys was reversed on appeal, the court holding that such a modification "is considered to be void or voidable" unless definitively shown to be fair and reasonable, free from undue influence, and made after a fair and full disclosure of the relevant facts. *Ward*, 51 Wn. App. at 428.

¶30 Burns misreads *Ward* as if it stood for the proposition that clients are never time-barred from suing a professional for overcharging them. He contends that the passage of time cannot validate an otherwise voidable contract. But the attorney defendants in *Ward* did not raise the statute of limitations as a defense. The plaintiffs were suing on a written contract, and it is clear from the facts recited in the decision that they sued before the expiration of the six-year limitation applicable to written contracts under RCW 4.16.040. Burns cites no authority for the proposition that voidability trumps the statute of limitations in a fee dispute, and we therefore reject that argument.

¶31 We conclude the trial court erred in tolling the statute of limitations on the claims arising out of the fee overcharges. The judgment for damages on those claims should have been limited to the overcharges that occurred within the three years before Burns filed suit. We remand to the trial court for the calculation of those damages.

## CONSUMER PROTECTION ACT

¶32 The trial court concluded that McClinton's overcharges violated the Consumer Protection Act.

17. Mr. McClinton's transfer to himself of the $2,500 monthly fee and other excess fees . . . without giving notice to Mr. Burns and obtaining his informed authorization for the fee increase was an unfair or deceptive act or practice in the entrepreneurial aspects of the practice of accounting.

18. These unfair or deceptive acts and practices had the capacity to deceive a substantial portion of the public and did in fact impact the public interest. In addition to non-disclosure of the fee increase to Mr. Burns, Mr. McClinton also failed to disclose other fee increases to many other clients.

In addition to the actual damages awarded for McClinton's breach of the oral contract and his breach of fiduciary duty, the trial court afforded Burns the special remedies that are available under the Consumer Protection Act: attorney fees; treble damages up to the $10,000 limit; and an injunction under RCW 19.86.090 to prevent further violations. The court entered a permanent injunction requiring McClinton to give at least 60 days written notice to clients and obtain their written agreement before increasing his accounting fees. McClinton contends that his conduct related to the overcharges does not meet the test for establishing a Consumer Protection Act violation.

¶33 To prevail in a private claim under the Act, a plaintiff must prove all of five distinct elements: (1) an unfair or deceptive act or practice (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). McClinton challenges the first and third elements.

¶34 To establish that the defendant committed an unfair or deceptive act or practice, a plaintiff "need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785.

Here, the act identified by the trial court is McClinton's failure to disclose fee increases to Burns.

¶35 Several cases decided after *Hangman Ridge* have developed what it means to say that a defendant's act had the capacity to deceive a substantial portion of the public: *Travis v. Wash. Horse Breeders Ass'n*, 111 Wn.2d 396, 406, 759 P.2d 418 (1988); *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, L.L.P.*, 110 Wn. App. 412, 438, 40 P.3d 1206 (2002); and *Segal Co. v. Amazon.com*, 280 F. Supp. 2d 1229 (W.D. Wash. 2003).

¶36 In *Travis*, the plaintiff attended a horse auction in the summer of 1981 and bought an expensive colt that turned out to be in poor condition, despite representations by the defendant sellers that the horses offered at auction were "truly outstanding" and "bound to run." *Travis*, 111 Wn.2d at 398. The plaintiff successfully sued under the Consumer Protection Act. There was evidence that the sellers, using media designed to reach new buyers, routinely represented horses as among the best in the state even though physical examinations were not routinely given, the sellers did not know whether the particular horses being offered had been given physical examinations, and unsound horses had been sold as a result of these customary selling practices. The court found this sufficient to prove the misrepresentations in the sellers' advertisements had the *capacity* to deceive a substantial portion of the public even though there was no evidence of any buyer other than the plaintiff who had purchased a defective horse at the 1981 summer auction. *Travis*, 111 Wn.2d at 406.

¶37 In *Micro*, an accounting firm sent a standard form advertisement to the plaintiff software company, promising "prompt local decision making." *Micro*, 110 Wn. App. at 438. Contemplating an initial public offering of stock, the software company hired the accountants to audit the company's financial statements for stock registration purposes. The accounting firm, beset by various delays, did not complete its work in accordance with the anticipated schedule. The underwriter withdrew, and the initial public offering was

never filed. The plaintiff's negligence claim went to trial and resulted in a verdict that the accountants, though negligent, had not caused damage. On appeal, one issue was whether the trial court erroneously dismissed a Consumer Protection Act claim on summary judgment. The reviewing court affirmed the dismissal on the basis that the accounting firm's promises of "prompt local decision making" and "special attention" did not have the capacity to deceive a substantial portion of the public:

> Coopers used standard form language in its proposal to prospective clients; language which guaranteed prompt local decision making. Coopers also sent other letters promising prompt local decision making to eight other potential clients. MEI argues from this that such a standard form proposal has the capacity to deceive others. And the CPA claim should then have gone to the jury.
>
> But the most MEI showed was that Coopers was in contact with eight other *unidentified* recipients of proposal letters that may have included similar promises. It made no showing that Coopers' placement of MEI on the special attention list had the capacity to deceive or deceived anyone other than MEI. And we find nothing in this record beyond MEI's speculation that Coopers directed proposals with the capacity to deceive to a *substantial portion of the public*.

*Micro*, 110 Wn. App. at 438-39 (citations omitted).

¶38 In *Segal*, defendant Amazon.com engaged Sibson (a division of Segal) to perform stock-option valuation and employee compensation proposals. Amazon stood by as Sibson began to accrue $390,000 in costs and fees but then advised Sibson that it no longer wanted the services requested. When Amazon refused to pay the accrued costs and fees, Sibson sued and alleged, among other theories, a violation of the Consumer Protection Act. The court granted Amazon partial summary judgment dismissing the Consumer Protection Act cause of action for failure to state a claim:

> In this case, the material portions of the complaint generally detail the formation and breach of a contractual relationship between only Sibson and defendant. . . . [T]he fact that defen-

dant may have engaged in additional commercial dealings does not indicate that its activities have the potential to deceive a "substantial portion" of the public.

*Segal*, 280 F. Supp. 2d at 1232-33 (citations omitted). This case is more like *Micro* and *Segal* than like *Travis*. The facts found by the court may establish that McClinton's breach of the fee agreement was deceptive to Burns, but they do not establish a practice with the potential to deceive other members of the public.

¶39 First, the record lacks evidence that any of McClinton's other clients were deceived. The evidence supporting the trial court's assertion that McClinton failed to disclose fee increases to other clients is virtually nonexistent. No testimony or documents identified other specific clients served by McClinton.

¶40 Burns would have us infer a pattern of nondisclosure solely from McClinton's answers to questions posed to him at trial. During the plaintiff's case, McClinton acknowledged deposition testimony in which he admitted raising rates to a group of clients in 1997 or 1998 without giving them *written* notice. He estimated the number of clients affected as "around two hundred to three hundred."[1] Later, responding to questions from his own counsel, McClinton testified that he did give *verbal* notice of the fee increases to all affected clients.[2] Burns cross-examined him about this testimony: "Please tell me, sir, the number of people you allegedly, verbally apprised of the fee increase. The number, please, your best estimate." McClinton answered, "Under 200," and testified that he was quite sure he told these clients of the fee increase before it occurred.[3] Burns then confronted him with the deposition testimony in which his estimate was "around two hundred to three hundred." He elicited McClinton's answer that his memory of the rate increase was no better at trial than it had been

---

[1] Report of Proceedings (RP) (Aug. 26, 2004) at 175.

[2] RP (Sept. 9, 2004) at 1062.

[3] RP (Sept. 9, 2004) at 1091.

at the deposition nine months earlier. Burns now suggests that a numerical discrepancy exists between McClinton's "under 200" estimate at trial and his "around two hundred to three hundred" estimate at his deposition, indicating that some clients did not get either verbal or written notice. In context it is not even clear that there is a discrepancy, and we do not regard this testimony by McClinton as substantial evidence of a pattern of nondisclosure.

¶41 Second, there was no evidence that McClinton's deception of Burns was capable of being replicated with his other clients. The relationship between Burns and McClinton was unusual, and not only because it included the element of personal friendship. Burns gave McClinton a very high degree of management control over the voluminous details of his personal finances without reading the reports and summaries provided to him. Burns has failed to show that McClinton's relationships with his other clients have ever presented a similar opportunity to conceal fee increases.

¶42 Because Burns has not proved the first element of a Consumer Protection Act violation, we need not address McClinton's arguments directed at the public interest impact element. We conclude the trial court erred in granting relief to Burns under the Consumer Protection Act. The portions of the judgment awarding attorney fees and exemplary damages and establishing a permanent injunction must be reversed.

## BUSINESS PARTNERSHIP CLAIMS

¶43 Below, Burns also accused McClinton of wrongdoing in their shared business ventures. In a cross-appeal, Burns challenges the trial court's decision to dismiss two of these claims on summary judgment. On review, we perform the same inquiry as the trial court and determine whether there is a genuine issue of material fact that prevents the moving party from being entitled to judgment as a matter of law. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

¶44 In 1995, Burns invited McClinton to replace his outgoing partner in a partnership known as DB&D. The partnership owned commercial real estate in Kent. Both parties signed an amended partnership agreement drafted by McClinton. The new agreement gave McClinton a 15 percent stake in the partnership. Unlike the previous agreement it allowed the minority partner, McClinton, to receive distributions. Burns claimed that he did not know about the provision allowing McClinton to receive distributions. He asked the court to void McClinton's 15 percent interest in the partnership and to order return of the sums McClinton had distributed to himself. The trial court dismissed this claim on summary judgment. The court rejected an argument that the agreement was void under *Ward* because McClinton's preparation of it constituted the unauthorized practice of law and also held that the claim was time-barred.

¶45 As McClinton points out in his brief replying to the cross-appeal of Burns, Burns has not cited any case in which an argument that an agreement was void or voidable was held to trump an otherwise applicable statute of limitations. It is undisputed that Burns voluntarily signed the amended agreement. Its provisions were in writing, plain to be seen. Burns has not identified any specific fact pertaining to the amended agreement that McClinton allegedly failed to disclose to him. The DB&D claim was time-barred, and the trial court properly dismissed it.

¶46 Burns also sued McClinton for breach of fiduciary duty arising out of McClinton's 1997 advice to invest $300,000 in American Flywheel, a company in which McClinton held shares and served as chief financial officer. The trial court found this claim, too, to be barred by the statute of limitations.

¶47 Burns contends there was a genuine issue of fact as to application of the discovery rule in that McClinton failed to inform him of the true financial risks of the company, a breach of fiduciary duty. However, he fails to identify facts overlooked by the trial court that might have excused him

from the obligation to discover his claim within the statutory time limit. For example, he fails to identify the information that McClinton allegedly should have given him about the company's financial risks.

¶48 Contrary to Burns' assertion in his reply brief, McClinton's motion for summary judgment below squarely presented the argument that the American Flywheel claim was beyond the applicable three-year statute of limitations in The Securities Act of Washington, RCW 21.20.430(4). Burns had the burden of proving facts that would support the tolling of the statute of limitations. This he failed to do. The trial court did not err in dismissing the American Flywheel claim.

## ATTORNEY FEES FOR D&D PROPERTIES LITIGATION

¶49 Burns contends the trial court erred by denying him an award of attorney fees to which he was entitled by virtue of a prevailing party attorney fee clause in a partnership agreement related to a third business venture, D&D Properties.

¶50 Burns and McClinton formed D&D in 1995 as equal partners. The partnership purchased land in Wenatchee to hold it for resale. McClinton, who proposed the venture, was designated as managing partner. At trial, the court found that McClinton breached his fiduciary duty as a partner by commingling partnership funds with his own and failing to make full disclosure of the partnership's financial matters. The court ordered McClinton to pay for an independent audit to determine whether this breach caused Burns any damages. The court also found McClinton breached his fiduciary duty as a partner when, at the time he proposed that they purchase the Wenatchee property, he failed to inform Burns that he had previously attempted to purchase the same property with another. The court ruled that whether this breach damaged Burns "will depend on whether the property is sold for its fair market

value. The fact and amount of damage are therefore reserved to conclusion of the sale and the final winding up of the business." The court also left unresolved, pending the sale of the Wenatchee property, a counterclaim by McClinton against Burns for breach of fiduciary duty in connection with pretrial attempts to sell the property. The parties have since stipulated to dismissal of McClinton's counterclaim.

¶51 Following the trial, Burns repeatedly requested an award of attorney fees for work done on issues related to D&D Properties. The basis for his request was a provision in the partnership agreement: "Should any party enforce this Agreement by appropriate legal action, the prevailing party shall be entitled to reasonable attorneys' fees and costs, including those on appeal." The trial court concluded fees were not available under this provision and denied Burns' request for an award of fees. Burns appeals this decision.

¶52 Generally attorney fees are not recoverable by the prevailing party as costs of litigation unless the fees are permitted by contract, statute, or recognized ground in equity. *Hudson v. Condon*, 101 Wn. App. 866, 877, 6 P.3d 615 (2000). The court allowed attorney fees in *Hudson* under a broad provision of a partnership agreement creating an entitlement to prevailing party attorney fees in any litigation "related to" the partnership. The provision in the D&D Properties agreement, however, is narrower. Attorney fees are not available except in an action enforcing the agreement.

¶53 The D&D-related claims by Burns and McClinton against each other alleged breach of fiduciary duties arising as a matter of law. Burns has not identified any specific clause or provision of the partnership agreement that either party attempted to enforce.

¶54 The request by Burns for an award of attorney fees based on the partnership agreement is not aided by the line of cases analyzing whether an action is "on a contract" for purposes of applying RCW 4.84.330. An action is on a

contract if it "arose out of the contract and if the contract is central to the dispute." *Tradewell Group, Inc. v. Mavis*, 71 Wn. App. 120, 130, 857 P.2d 1053 (1993). The D&D Properties partnership agreement was not central to the parties' disputes, which could be resolved without referring to it.

¶55 Burns contends that the partnership agreement was central to the dispute because if there had been no partnership agreement, McClinton would not have been in a position to commit his various breaches. It is true that we accepted similar reasoning in *Western Stud Welding, Inc. v. Omark Industries, Inc.*, 43 Wn. App. 293, 299, 716 P.2d 959 (1986):

> Without the stock purchase and sale agreement, Simonseth would not be in the position of bearing the resulting financial loss from the discontinuation of the KSM distributorship. The contract cannot be overlooked in the analysis of these circumstances.

¶56 Since *Western Stud*, however, the Supreme Court has explained that mere but-for causation is insufficient to render a dispute "on a contract":

> When the underlying documents merely provide the background out of which the surety allegedly acquires new rights and duties by operation of law and by their voluntary actions in obtaining the assignee, it is apparent that the action is not "on the contract." The surety's argument, and the holding of the Court of Appeals, is analogous to a but-for argument in a proximate cause question. Rejecting that approach, we conclude that the voluntary actions of the original makers of the note created the central issue of the legal effect of their actions in creating a possible suretyship relationship. Therefore, if the sureties prevail on retrial, they are not entitled to attorney fees.

*Hemenway v. Miller*, 116 Wn.2d 725, 743, 807 P.2d 863 (1991). *See also Tradewell*, 71 Wn. App. at 130 (despite attorney fee provision in lease, lessor not entitled to attorney fees for defending against grocery chain's claims of tortious interference, unjust enrichment, and promissory

estoppel arising out of lessor's failure to deliver a signed extension of the lease).

¶57 The D&D partnership agreement was the background out of which the disputes arose, but it was not central to them. Because the claims in question were not brought to enforce the partnership agreement and the agreement was not central to the dispute, the trial court correctly concluded that the agreement does not provide a basis for awarding prevailing party attorney fees to Burns. For the same reasons, we deny his request for fees on appeal for his work related to D&D Properties.

■■■■■■ ¶58 Burns also contends he is entitled to attorney fees for the D&D Properties litigation on an equitable basis because he established a breach of fiduciary duty. Such an award is discretionary. *Green v. McAllister*, 103 Wn. App. 452, 468, 14 P.3d 795 (2000). Burns has waived this argument because he has not shown that he asked the trial court to award attorney fees on this equitable basis. Nor has he explained why denying such a request would be an abuse of discretion. His request for attorney fees on appeal on this equitable basis is untimely as it is mentioned for the first time in his reply brief. RAP 18.1(b). We deny that request.

## SUMMARY

¶59 The judgment is reversed insofar as it awards damages for overcharges occurring within the three years before Burns filed suit and insofar as it provides remedies and attorney fees under the Consumer Protection Act. In all other respects, it is affirmed. The request by Burns for an award of attorney fees on appeal is denied.

COLEMAN and COX, JJ., concur.

Review denied at 161 Wn.2d 1006 (2007).